IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
                Plaintiff,

vs.                                        No. CR 14-415 JP

ANTHONY CHEUN,
                Defendant.

**DEFENDANT ANTHONY CHEUN'S MOTION TO SUPPRESS EVIDENCE
AND STATEMENTS AND MEMORANDUM IN SUPPORT THEREOF**

COMES NOW, Anthony Cheun, by and through his counsel of record, Erlinda O. Johnson, Esq., and hereby respectfully moves this Court for an order suppressing all evidence seized from his person and his personal belongings on January 29, 2014. As grounds, Mr. Cheun submits the following memorandum brief:

**INTRODUCTION**

According to the investigative reports in the above captioned case and a recording of the encounter between agents and Mr. Cheun, on January 29, 2014, agents with the Drug Enforcement Administration (DEA) were working at the Amtrak Train Station in Albuquerque, New Mexico. Prior to the arrival of Amtrak train number 4 from Los Angeles, California, DEA Agent Kevin Small reviewed the Amtrak train's passenger manifest. Agent Small reviewed a reservation for passengers Phillip

1

Maddaleni and Anthony Cheun who were traveling from Flagstaff, Arizona to Chicago, Illinois and had purchased one-way tickets on January 24, 2014.

Upon the arrival of Amtrak Train number 4 in Albuquerque, New Mexico, DEA Agent Small, boarded the train's Sleeper car 431. Agents Small walked directly to sleeper room D. He knocked on the door. A few moments later, Phillip Maddaleni opened the door. Agent Small introduced himself to Mr. Maddaleni and asked him if he could speak with him. Mr. Maddaleni responded by saying, "sure. Let me grab a shirt." Mr. Maddaleni went back into the sleeper room to retrieve a shirt. He returned moments later to Agent Small who was waiting right outside the roomette's door.

Agent Small proceeded to ask Mr. Maddaleni questions about where he began his journey and whether he had his ticket with him. Mr. Maddaleni told Agent Small that he had to retrieve his ticket. Mr. Maddaleni also informed Agent Small that he needed to use the bathroom. Mr. Maddaleni retreated back into the room and shut the door. In response to that, Agent Small stated to someone else, presumably another agent, "What the!—lave the door shut—you want to open the door?" And in the same breath continued by saying, "that's all right." Mr. Maddaleni reappeared at the door and continued to speak with Agent Small. Agent Small continued asking Mr. Maddaleni questions about his and Anthony Cheun's travels.

After questioning Mr. Maddaleni about his and Mr. Cheun's travels, Agent Small asked:

| | |
|---|---|
| K. SMALL: | All right. All right. I'll tell you what's going on, Phil. I talk to everybody here on board the train. Just talked to your neighbors next door. When you got on in Flagstaff, where-, no security, we have problems with people smuggling guns, drugs, contraband, and all that kind of stuff. Do you have any luggage with you at all? |
| P. MADDELENI: | Yeah. |
| K. SMALL: | Where's that located? |
| P. MADDELENI: | It's in here. |
| K. SMALL: | Okay. How many pieces do you have? |
| P. MADDELENI: | I have one piece. Just that one piece, no– |
| K. SMALL: | And that? |
| P. MADDELENI: | –two pieces. |
| K. SMALL: | Two pieces. You don't have any guns, drugs, or contraband in them do you? |
| P. MADDELENI: | No. |
| K. SMALL: | Okay. Well would you consent for me to search and make sure? Would that be all right with you? |
| P. MADDELENI: | Ahhh. Sure. |
| K. SMALL: | All right. |
| P. MADDELENI: | Can I pee real quick? |
| K. SMALL: | Yeah, go right ahead. I noticed-, I told you to take-, you to take your time. Do what you need to do there, go right ahead. |
| P. MADDELENI: | All right. Let me pee real quick. |
| K. SMALL: | All right. |

Mr. Maddaleni retreated back into the sleeper room for several minutes. During that time Agent Small engaged in casual conversation with two other passengers. Notably, Agent Small's questions to the two other unknown passengers were markedly different from the barrage of rapid-fire questions to which he subjected Mr. Maddaleni and to which he was soon to subject Mr. Cheun.

After a few minutes, Mr. Cheun emerged from the sleeper room. Agent Small abruptly interrupted his casual conversation with the other two passengers and told Mr. Cheun, "excuse me. Hello sir. How are you doing?" Mr. Cheun answered, "oh okay. How are you?" Agent Small rapidly continued by telling Mr. Cheun, "Good. I'm with the police department here in Albuquerque." "May I speak with you for a moment." According to the recording, Mr. Cheun said, "yeah." Agent Small immediately began to ask Mr. Cheun about his travels, the person with whom he was traveling (Maddaleni) and the purpose of the travel. At one point, Agent Small asked Mr. Cheun, "[d]o you have your ID with you, or no?" Mr. Cheun answered, "[n]o, I can't find it. I have my passport." Agent Small told Mr. Cheun, "that'd be great, that'd be great." Mr. Cheun told Agent Small that he would have to go look. At that time, Mr. Cheun retreated back into the sleeper room.

Immediately after Mr. Cheun went back into the roomette, Agent Small called DEA Agent Jarrell Perry and said,

> Hey Jay, when you guys are done with the bus come to the
> first sleeper car. Oh, you are, okay. I didn't know where-.
> I'm on the very first sleeper car. I got two in a room and
> they're not coming out too good. I think I may but I don't
> know what it is, Jay. I'm in room D. Room D of the first sleeper.
> All right. Oh, dog gonnit it's the girl. It's the girl car attendant.
> So-, all righty.

A few minutes later, Mr. Cheun re-emerged from the sleeper room and asked Agent Small, "[w]hat did you need with this?" Agent Small said, "[j]ust your passport." Agent Small then continued asking Mr. Cheun questions about his and Mr. Maddaleni's travels. By this

4

point, Agent Perry and DEA Task Force Officer Jonathon Walsh had arrived to join Agent Small in the encounter. Mr. Cheun could see the additional agents who had now joined Agent Small.

At that point, Agent Small told Mr. Cheun,

> All right. Well I'll tell you what-, what's going on, Mr. Cheun. I work for DEA, drug enforcement like I told your partner. We just have a problem here on board the train. Do you have any luggage with you at all?

Mr. Cheun responded, "I do." The following exchange occurred thereafter,

> K. SMALL: And where's that located?
> A. CHEUN: It's here.
> K. SMALL: Where's here?
> A. CHEUN: Up here.
> K. SMALL: In your room?
> A. CHEUN: Yeah.
> K. SMALL: You don't have any guns, drugs, or contraband in it, do you?
> A. CHEUN: No.
> K. SMALL: Would you consent–
> A. CHEUN: You want to look into it?
> K. SMALL: Would you give me permission to search it? Would that be all right with you?

At this point, Mr. Cheun was reluctant and almost frightened as he asked, "[y]eah, umm, but for what reason, though?" Agent Small proceeded to explain issues regarding security when passengers board the train. Mr. Cheun then proceeded to tell Agent Small, "[y]eah, because I'm like-, what are you? I'm like, I didn't do anything. I just woke up." Mr. Cheun was visibly upset and was looking at the other two agents accompanying Agent Small. At that point, Agent Small advised Mr. Cheun, "[t]his.. he's my partner that's all, so-

5

-" Mr. Cheun then asked the agents, "oh, okay. You just want to look in my bag?"  Agent Small said, "yeah."  Mr. Cheun then opened the door to the sleeper room.  At which time, Agent Small observed Mr. Maddaleni standing next to an open suitcase lying on the bed.  Agent Small asked Mr. Maddaleni if he could go into the room.  According to the recording, Mr. Maddaleni is heard saying, "sure."  As Agent Small entered the roomette, the other two agents moved closer to the roomette's doorway.  Indeed, Agent Small said, "[a]ll right.  I'll just step into the room here.  This is my partner right there."

Agent Small asked Mr. Maddaleni if the bag on the bed belonged to him and if he would give him permission to search it.  According to the recording, Mr. Maddaleni said, "yeah."  Within a few moments, Agent Small is heard directing Mr. Maddaleni,

> All right. I want you step out for me?
> Can you just walk down to my partner down there?
> And turn around and face me

One of the other two agents told Mr. Maddaleni, "[p]ut your hands behind your back."  Mr. Cheun who was standing by Agent Perry witnessed the entire incident.  Almost immediately after the handcuffs were placed on Mr. Maddaleni, Agent Small's tone changed as he confronted Anthony Cheun and stated, "[y]our Partner is under arrest – Do you have a suitcase with you?" Notably, Agent Small did NOT pause between the statement "Your partner is under arrest" and the interrogative question "Do you have a suitcase with you."  Agent Small did not advise Mr. Cheun of his Constitutional right pursuant to the Fifth Amendment to the United States Constitution in order to allow Anthony Cheun to

6

recognize and consider his right to remain silent and to refuse consent to search his property. In a hesitant response, Anthony Cheun stated, "Um - I do" and Agent Small asked, "[d]o you have some drugs in it?" Mr. Cheun immediately protested and said, [w]ait? Phil, what did you do?"

Without a second's hesitation and in a more commanding tone, Agent Small asked Mr. Cheun, "[w]hich bag, show me which bag is yours?" Mr. Cheun hesitantly answered, "[m]ine is the grey one." The following rapid fire questioning occurred,

| | |
|---|---|
| K. SMALL: | All right. What, where-, I don't see a grey one. |
| A. CHEUN: | Over there. |
| K. SMALL: | You don't have any guns, drugs, or contraband in there? |
| A. CHEUN: | No. |
| K. SMALL: | Would you give me permission to search it? |
| A. CHEUN: | You can look in there, yes. |
| K. SMALL: | All right. Why don't you stay out here for me, all right? |

Mr. Cheun was directed to go stand near Agent Perry. Mr. Cheun asked Agent Perry, "[h]ey, what-, what did you find in his bag? I thought he was doing something crazy." At that point, Agent Small directed Mr. Cheun by ordering him, "[j]ust a sec-, I want you to stay in there, all right. And this is your bag?" Mr. Chuen sheepishly answered, "yeah." In a very pointed tone, Agent Small asked, "And you're giving me permission to search it?" Mr. Cheun answered, "yes, yes."

Agent Small is then heard rifling through the bag, tearing wrappings. At one point, he came across another wrapped package and asked Mr. Cheun if he would give him permission to open it. Mr. Cheun told him that he didn't want Agent Small to rip it. At one

7

point during Agent Small's search of Mr. Cheun's bag, Agent Small directed Mr. Cheun to tell Agent Perry what was contained in one of the other packages found in his bag. Mr. Cheun did not provide the agents consent a large gift bag Agent Small had found in the suitcase. However, Agent Small continued to search the bag and unwrapped other items, including two new glass pipes that had been securely wrapped with bubble wrap. Agent Small subsequently directed Agent Perry to arrest Mr. Chuen.

## ARGUMENT

### *The Encounter With Mr. Cheun Escalated to a Non-consensual Encounter Resulting in an Unlawful Search and Seizure, Therefore the Fruits Thereof Must be Suppressed*

The Fourth Amendment of the United States Constitution protects citizens from "unreasonable searches and seizures" conducted by government officials. U.S. Const. Amend. IV; *Mapp v. Ohio*, 367 U.S. 643, 655 (1961). In applying these Fourth Amendment protections, the Courts have recognized "three categories of police-citizen encounters: (1) consensual encounters which do not implicate the Fourth Amendment; (2) investigative detentions which are Fourth Amendment seizures of limited scope and duration and must be supported by a reasonable suspicion of criminal activity; and (3) arrests, the most intrusive of Fourth Amendment seizures and reasonable only if supported by probable cause." *United States v. White*, 584 F.3d 935, 944-45 (10th Cir. 2009). "'These categories are not static, and may escalate from one to another.'" *Id.*

8

(*quoting Cortez v. McCauley*, 478 F.3d 1108, 1115 n.5 (10th Cir. 2007) and *United States v. Shareef*, 100 F.3d 1491, 1500 (10th Cir. 1996)).

In this case, it is anticipated that the government will argue that the encounter between DEA agents and Mr. Cheun was consensual.  Even if this Court were to find that the initial encounter was consensual, as soon as Mr. Maddaleni was arrested, the encounter with Mr. Cheun quickly escalated into an unlawful detention lacking in probable cause.[1]  It is evident from the audio recording of the encounter that as soon as Mr. Maddaleni was arrested by agents, in front of Mr. Cheun, Agent Small's tone changed and he quickly turned and confronted Mr. Cheun.  Agent Small's rapid fire and more aggressive questioning, while Agent Perry stood next to Mr. Cheun, resulted in a seizure and thus a non-consensual encounter.

A reasonable person in Mr. Cheun's position cannot be expected to think he could ignore the agent's imperatively spoken requests.  While the defense recognizes that law enforcement officers do not violate the Fourth Amendment by approaching an individual and asking him if he is willing to answer questions, *Florida v. Bostick*, 501 U.S. 429, 434 (1991), "the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about

---

[1] As will be argued later in this motion, immediately after Mr. Maddaleni's arrest, the questioning of Mr. Cheun was custodial, therefore necessitating the advisement of rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966) and the suppression of evidence derived from said constitutional violation.

9

his business." *Id*. at 437. The inquiry is an objective one. *United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003). Accordingly, to the extent that a law enforcement officer acts in such a way as to indicate to a reasonable person that he is not free to decline the encounter, it is non-consensual and unreasonable under the Fourth Amendment.

While not all personal intercourse between policemen and citizens involves seizures of persons, when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen, courts have concluded that a seizure has occurred. *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968). A restraint on liberty "readily bears the meaning of a laying on of hands or application of physical force to restrain movement." *California v. Hodari D.*, 499 U.S. 621, 626 (1991). However, where that is absent, "a seizure can still be found where the individual has demonstrated a submission to the assertion of authority." *Id*. Indeed, when an individual's submission takes the form of passive acquiescence, the test for telling when a seizure occurs is whether, in light of all the surrounding circumstances, a reasonable person would have believed he was not free to leave. *E.g., United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "[A] mere submission in orderly way to actions of arresting agents, is not that consent which constitutes unequivocal, free and intelligent waver of [a] fundamental right." *United States v. Gregory*, 204 F.Supp. 884, 885 (D.C.N.Y. 1962).

The standard of whether a reasonable person would feel free to leave was modified slightly in *Florida v. Bostick*, 501 U.S. 421 (1991) a case concerning drug

10

interdiction on interstate buses. Given that Bostick was not literally "free to leave" the bus without unexpectedly interrupting his journey, the Court reformulated the *Mendenhall* test to read: "[T]he appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Id* at 436.

Courts also consider other factors in determining whether a police-citizen encounter becomes a seizure: the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers, *United States v. Ward*, 961 F.2d 1526, 1531 (10th Cir. 1992), whether the officers touch or physically restrain the defendant, *id.* at 1533, whether the officers are uniformed or in plain clothes, whether their weapons are displayed; the demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets and identification; and whether or not they have specifically advised the defendant whether he has the right to terminate the encounter or refuse to consent. *Id.*; *See also United States v. Ray*, 973 F.2d 840, 842-43 (10th Cir. 1992). In some cases, the presence of two agents may, in some circumstances, increase the coerciveness of the encounter. 961 F.2d at 1533.

In Mr. Cheun's case, from the outset, Agent Small persisted in continuing the encounter despite the fact that Messrs. Maddaleni and Cheun closed the door in his face at least two to three times. He remained steadfast standing outside the roomette's door.

11

Arguably, Agent Small's initial encounter with Mr. Cheun was not consensual. Agent Small quickly enlisted the assistance of two other agents who responded to the cramped space, without delay. By the time Agent Small began his encounter with Mr. Cheun, there were at least two other agents present. Mr. Cheun was hesitant and unsure during Agent Small's questioning. In fact, when Agent Small first asked if he could search Mr. Cheun's bag, Mr. Cheun asked "but for what reason?" Notably, as Agent Small was telling Mr. Cheun why he wanted to search his bag, Mr. Cheun was staring at Officer Walsh peering down at Mr. Cheun, with exposed handcuffs hanging from his belt. Mr. Cheun's perplexed look evidently prompted Agent Small to tell Mr. Cheun, "This.. he's my partner, that's all, so—"

During this time, Agent Perry was also standing nearby and indeed within view of Mr. Cheun. Mr. Cheun was compelled to agree to allow the ever persistent Agent Small to enter the roomette to search his bag. Once the agent entered the roomette, however, he focused on Mr. Maddaleni and asked him if he could search his bag. Mr. Maddaleni appeared to allow Agent Small to search his bag. Shortly thereafter, agents placed Mr. Maddaleni under arrest. Mr. Cheun observed the arrest and watched as Mr. Maddaleni was taken away in handcuffs. Wasting no time in escalating the aggressiveness of his tone, Agent Small quickly confronted Mr. Cheun and pointedly told him, "[a]ll right. Your partner's under arrest. Do you have a suitcase with you?" Mr. Cheun replied, "I do."

The following custodial questioning continued,

K. SMALL:        Do you any-, some drugs in it?

| | |
|---|---|
| A. CHEUN: | Wait?  Phil, what did you do? |
| K. SMALL: | Which bag, show me which bag is yours? |
| A. CHEUN: | Mine is the grey one. |
| K. SMALL: | All right.  What, where-, I don't see a grey one. |
| A. CHEUN: | Over there. |

Agent Small continued by asking Mr. Cheun if he would give him permission to search his bag.  Resigned and believing he had no other choice, Mr. Cheun said, "you can look in there, yes."  Agent Small then ordered Mr. Cheun to stay right outside his roomette with Agent Perry by saying, "[a]ll right.  Why don't you stay out here for me, all right?"  A few seconds later Agent Small reiterated, "[j]ust a sec-, I want you to stay in there, all right."  Indeed, a citizen in Mr. Cheun's position could not have been expected to decline to continue the encounter.  *See United States v. Fox*, 600 F.3d 1253, 1258 (10th Cir. 2010)(even where a citizen could have instructed officer to leave her alone, "we do not think that under the circumstances a reasonable person would have felt free to do so.")

In *Fox,* the Tenth Circuit held that a seizure had taken place based upon the display of uniformed authority and instructions, even though "[t]hroughout the encounter, the officers spoke calm, conversational tone with Ms. Chiles.  They never displayed their weapons nor did they make any explicit threats or promises." 600 F.3d at 1256.  The tone of Agent Small's questions would convey to a reasonable person that he was not free to ignore him.  An encounter between police and a citizen is not consensual and therefore subject to fourth Amendment protection when, considering all the surrounding circumstances, the police conduct would have communicated to a

13

reasonable person that the person was not free to decline the officer's requests or otherwise terminate the encounter. *United States v. King*, 990 F.2d 1552, 1556 (10th Cir. 1993).

The government bears the burden of proving that consent was freely and voluntarily given. *United States v. Sandoval*, 29 F.3d 537, 539 (10th Cir. 1994). The government must prove that consent was given without implied or express duress or coercion. *United States v. McRae*, 81 F.3d 1528, 1537 (10th Cir. 1996). To demonstrate voluntariness of consent, the government must proffer clear and positive testimony that consent was unequivocal and specific and freely and intelligently given. *Id.*

Consent must be the product of an essentially free and unconstrained choice. *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Courts may also consider the following relevant considerations when examining whether, under the totality of the circumstances, defendant's consent was unequivocal and specific and freely and intelligently given and was given without implied or express duress or coercion:

> physical mistreatment, use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone, the physical and mental condition and capacity of the defendant, the number of officers on the scene, and the display of police weapons. Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs defendant of his or her right to refuse consent also are factors to consider in determining whether consent given was voluntary under the totality of the circumstances.

*United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). Defendant's "subjective state of mind" regarding police officers "may be relevant to some degree to the issue of the voluntariness of [his] consent," *United States v. Zapata*, 997 F.2d 751, 757 (10th Cir.1993), but must be considered in light of all the other relevant circumstances. *United States v. Hill*, 199 F.3d 1143, 1150 (10th Cir. 1999). Additionally, an officer's failure to inform an individual that he is free to refuse consent is also a relevant factor for the court to consider in determining whether coercion occurred. *See United States v. Broomfield*, 201 F.3d 1270, 1275 (10th Cir. 2000). Although no single factor is dispositive, the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred. *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1203 (10th Cir. 2006)

    Here, Mr. Cheun was surrounded by three agents as he watched Mr. Maddaleni escorted away in handcuffs. Mr. Cheun was thereafter surrounded by Agents Small and Perry when Small, in an accusatory tone, told Mr. Cheun that his "partner's been arrested." Agent Small then proceeded to rapidly inquire into the location of Mr. Cheun's luggage. Agent Small failed to advise him of his constitutional rights prior to engaging in what had transformed into a custodial interrogation. With an agent essentially on either side, Mr. Cheun had no choice but to agree with agents. What resulted was a non-consensual search of Mr. Cheun's bag and the unlawful seizure of its contents. Accordingly, any evidence seized therefrom must be suppressed.

15

*After the Arrest of Mr. Maddaleni, Mr. Cheun was Subjected to a Custodial Interrogation, Requiring Warnings Pursuant to Miranda v. Arizona*

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602 (1966), requires police officers to warn detainees of their applicable constitutional rights before custodial interrogation occurs. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 86 S.Ct. at 1612. "In order to determine whether or not a person is in custody for *Miranda* purposes, a court must examine all relevant facts, the only inquiry being how a reasonable person in the suspect's position would have understood his situation." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993). If, from an objective viewpoint, the detainee would reasonably believe freedom of action had been curtailed to a degree associated with formal arrest, then custody exists. *Id.*

The purpose of the protections pursuant to *Miranda v. Arizona, supra,* is a deterrent to the use by overzealous police of interrogation techniques that may overbear the will of defendants and lead to involuntary and unknowing waivers of the right against self-incrimination. In *Dickerson v. United States,* 530 U.S. 428, 442 (2000), the United States Supreme Court held that *Miranda* announced a constitutional rule, not merely a fungible ritual for which something lesser could be substituted. 530 U.S. at 442.

In this case, Mr. Cheun was deprived of his freedom and subjected to custodial questioning immediately after Mr. Maddaleni was arrested and led away in handcuffs. A reasonable person in Mr. Cheun's position would not have felt that he was free to leave and thus was in custody. Accordingly, Agent Small was required to advise him of his constitutional rights pursuant to *Miranda v. Arizona*.

This case presents the most flagrant violation of a constitutionally protected right. Not only should all of Mr. Cheun's answers to the agents' questioning be suppressed but also the evidence derived therefrom.

### *The Methamphetamine was Seized as a Result of a Constitutional Violation and Thus Should be Suppressed*

Once the accused has established a constitutional violation, the doctrine set forth in *Wong Sun v. United States,* 371 U.S. 471 (1963), must apply and the fruits seized as a result of the constitutional violation must be suppressed. *See New Jersey v. Portash*, 440 U.S. 450, 458-59 (1979). The United States Supreme Court in *United States v. Patane*, 542 U.S. 630, 642-43 (2004) signaled the willingness to apply the doctrine enumerated in *Wong Sun, supra,* to a constitutional violation. *Id.* at 643.

Although in *Patane,* the Supreme Court refused to suppress evidence seized as a result of voluntary statements taken without *Miranda* warnings, it indicated that the Court will require the exclusion of the physical fruit of actually coerced statements. *Id.* at 644. Unlike the facts in *Patane, supra*, what we have here are coerced statements

17

obtained as a result of violations of a constitutionally protected right. Therefore, any evidence seized as a result of that violation must also be suppressed as the fruit of the poisonous tree. It is one thing not to allow the fruit-of-the- poisonous- tree doctrine to infect everything that follows a *Miranda* blunder as the one in *Patane*, but it is wholly another to exempt from the reach of the exclusionary rule the deviant tactics used in this case.

The evidence seized here as a result of the agents' violation of Mr. Cheun's constitutionally protected rights is the methamphetamine found in his bag. This methamphetamine was actually seized after Mr. Cheun's was interrogated by Agent Small without first advising Mr. Cheun of his constitutional rights. By the time Agent Small asked Mr. Cheun if he could search his bag, he was detained. When a police officer accosts an individual and restrains his freedom to walk away, he has "seized" that person within the meaning of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Mr. Cheun's purported consent to search was not voluntary but rather the product of a constitutional violation. *See United States v. Carter*, 884 F.2d 368, 374-75 (8th Cir. 1989). Therefore, any evidence seized as a result of that violation, i.e., the methamphetamine must also be suppressed.

Moreover, the purported consent to search does not cure the constitutional violation and make the seizure of the methamphetamine lawful. A consent to search is valid only if two specific conditions are met: "(1) there must be a clear and positive

testimony that consent was unequivocal, specific and freely given; and (2) the government must prove consent was given without duress or coercion, express or implied." *United States v. Butler*, 966 F.2d 559, 562 (10th Cir. 1992).  The Government bears the burden of showing that a defendant's consent was voluntary under the totality of the circumstances. *United States v. Fernandez,* 18 F.3d 874 (10th Cir. 1994).

      The purported consent provided by Mr. Cheun was not voluntary but rather the product of coercion and a violation of a constitutionally protected right.  When interrogated by Agent Small about which bag belonged to Mr. Cheun and whether the agent could search it, Mr. Cheun was detained.  He was in de facto custody.  Under these circumstances, the request to search cannot be considered lawful because the defendant was not free to leave.  *See United States v. Lee,* 73 F.3d 1034, 1040 (10th Cir. 1996); *see also United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005).  Therefore, the evidence seized subsequent to the execution of the purported consent to search, must be suppressed.  *See Dunaway v. New York*, 442 U.S. 200, 216 (1979)

      Wherefore, for the foregoing reasons, Mr. Cheun respectfully requests this Court suppress all evidence seized from Mr. Cheun on January 29, 2014, as violative of the Fourth and Fifth Amendments to the United States Constitution.

                    Respectfully Submitted,

                    <u>electronically filed 6/4/14</u>
                    Erlinda O. Johnson
                    Counsel for Anthony Cheun
                    1110 2nd Street N.W.
                    Albuquerque, NM 87102

I hereby certify that a true and correct
Copy of the foregoing was provided
To AUSA Pflugrath, on this 4th
Day of June, 2014.

_____/s/_____
Erlinda O. Johnson
Attorney at Law