UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO
ALBUQUERQUE DIVISION


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO: 1:14-MJ-00273-RHS |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Albuquerque, New Mexico |
| | ) | |
| PHILIP MADDALENI, | ) | Friday, January 31, 2014 |
| ANTHONY CHEUN, | ) | |
| | ) | (9:42 a.m. to 10:25 a.m.) |
| Defendants. | ) | |


PRELIMINARY EXAMINATION / DETENTION HEARING

BEFORE THE HONORABLE ROBERT H. SCOTT,
UNITED STATES MAGISTRATE JUDGE


**APPEARANCES**:          See next page

Court Reporter:          Recorded; Digital; Hondo

Clerk:                   C. Lopez

Transcribed By:          Exceptional Reporting Services, Inc.
                         P.O. Box 18668
                         Corpus Christi, TX 78480-8668
                         361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

<u>APPEARANCES FOR:</u>


Plaintiff:                  MARK BAKER, ESQ.
                            U.S. Attorney's Office
                            District of New Mexico
                            P.O. Box 607
                            Albuquerque, NM 87103

Philip Maddaleni:           JOHN F. ROBBENHAAR, ESQ.
                            Assistant Federal Public Defender
                            111 Lomas Boulevard NW
                            Suite 501
                            Albuquerque, NM 87102

Anthony Cheun:              DANIEL J. TALLON, ESQ.
                            6 Placitas West Road
                            Placitas, NM 87043

U.S. Pretrial/Probation: Sandra Avila-Toledo

<u>INDEX</u>

| GOVERNMENT'S WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| KEVIN SMALL | | | | |
|   BY MR. BAKER | 5 | | | |
|   BY MR. TALLON | | 12 | | |
|   BY MR. ROBBENHAAR | | 34 | | |

<u>ARGUMENT</u>

| | | |
|---|---|---|
| BY MR. TALLON | 38 | |
| BY MR. BAKER | 40 | |
| BY MR. ROBBENHAAR | 43 | |

<u>RULING</u>                    44

1      **Albuquerque, New Mexico; Friday, January 31, 2014; 9:42 a.m.**

2                              **(Call to Order)**

3              **THE CLERK:**  *United States of America versus Philip*

4      *Maddaleni and Anthony Cheun -- or Cheun.*

5              **MR. TALLON:**  Cheun.

6              **THE CLERK:**  Cheun.

7              **THE COURT:**  Would you restate your appearances,

8      please, for our record, counsel.

9              **MR. ROBBENHAAR:**  Yes.  John Robbenhaar on behalf of

10     Philip Maddaleni, who is present this morning.

11             **MR. TALLON:**  Good morning again, your Honor.  Dan

12     Tallon appearing on behalf of Anthony Cheun, who is present and

13     in custody this morning.

14             **THE COURT:**  Good morning, Counsel.  We are here for

15     preliminary hearings.

16             Is the Government ready to proceed?  Mr. Baker, is

17     the Government ready to proceed?

18             **MR. BAKER:**  We are, your Honor.

19             **THE COURT:**  All right.  Counsel, you may have a seat,

20     please.  The Government may call your first witness.

21             **MR. BAKER:**  All right, your Honor.  The United States

22     calls Special Agent Kevin Small.

23     *//*

24     *//*

25     *//*

1              **KEVIN SMALL, GOVERNMENT'S WITNESS, SWORN**

2          **THE CLERK:**  Will you please have a seat, and if you

3    could state and spell your last name for the record.

4          **THE WITNESS:**  My name is Kevin Small, S-M-A-L-L.

5          **THE COURT:**  Counsel, your witness.

6                         **DIRECT EXAMINATION**

7    **BY MR. BAKER:**

8    Q    All right.  Good morning, Agent Small.

9    A    Good morning.

10   Q    What do you do for a living?

11   A    I'm employed by the United States Department of Justice

12   Drug Enforcement Administration.

13   Q    And what are your job responsibilities in that position?

14   A    I'm assigned to a drug interdiction unit that focuses our

15   attention on the Greyhound bus station and Amtrak train station

16   here in Albuquerque, New Mexico, Bernalillo County.

17   Q    How long have you worked with DEA?

18   A    Thirty-one years.

19   Q    All right.  Have you been involved in the investigation of

20   Philip Maddaleni and Anthony Cheun?

21   A    I am.

22   Q    And do you see both of those gentlemen in the courtroom

23   today?

24   A    Yes.

25   Q    Would you please identify them.

1  A    Phil is -- well, they're both wearing orange jumpsuits --

2  and sitting to my right in the front seat, and Anthony is

3  sitting to my left in the second seat.

4           **MR. BAKER:**  Your Honor, would the record reflect that

5  the defendants have been properly identified?

6           **THE COURT:**  It shall so reflect.

7       **(The witness identified the defendants)**

8  **BY MR. BAKER:**

9  Q    All right.  Agent Small, how did this case come to your

10 attention?

11 A    I was at the Amtrak train station here in Albuquerque when

12 Amtrak train number four arrived.  It arrived around 10:30,

13 10:45.  In our normal practice we went through the -- the

14 train; it wasn't very crowded.  I went to the sleeper cars and

15 asked the car attendant if she had any passengers get on in

16 Flagstaff.  She said that she did.  I said, "Have you seen

17 them?"  She goes, "No, they've been in their room and they

18 haven't come out."

19          So, I went to the door, knocked on the door, and they

20 were in Room D; they were the only room occupied up there.  And

21 Phil opened the drape, looked at me, and I had my badge hanging

22 around my neck.  I said, "Hello.  How are you doing today?"  It

23 took him maybe 30 seconds; he got up, opened the door, and

24 walked out to me, and he shut the door immediately behind him.

25 And I introduced myself, said I was with the police department,

Small - Direct / By Mr. Baker                                7

1   "May I speak to you for a second"?  He said, "Sure."  Said -- I

2   asked where they were headed to; he said Chicago.  And asked

3   him where they were coming from; he said Flagstaff.  I asked

4   him how long they were in Flagstaff.  He said they were

5   actually down in Phoenix for a few days.  I asked him how they

6   got to Phoenix, and they said they flew to Phoenix.  And I --

7   he said "they," so I said, "Are you with somebody else?"  He

8   said, "Yes."  I said, "Well, this is what's going on.  I" -- he

9   had his ticket with him, which was printed on a piece of paper.

10  I said, "I hate to do this to you, but do you have your I.D.

11  with you?"  So, he went back in the room and shut the door.

12  And I waited.  And a few minutes -- seconds later, maybe 35

13  seconds later, he came back out with his I.D., and it was a

14  Illinois driver's license with his name on it and -- and the

15  town of Addison, Illinois.

16          So, I told him what was going on.  I said, "I work

17  for DEA, drug enforcement.  We have a problem with people using

18  the train to smuggle guns, drugs, and narcotics."  I said, "Do

19  you have any luggage with you today?"  He said, "Yes."  And I

20  said, "Where is it?"  I believe he said it was "here."  I said,

21  "Where is here?"  And he said, "In the room."

22          **THE COURT:**  Excuse me.  Counsel, would you please put

23  a question to the witness?

24          **MR. BAKER:**  Sure.  Sure.

25  //

```
                    Small - Direct / By Mr. Baker                8
```

1   **BY MR. BAKER:**

2   Q    All right.  So, we've gone through the introductions where

3   you've spoken to them.  Eventually did -- did they point out

4   their luggage to you?

5   A    Yes.  About nine or ten minutes passed, and he actually

6   went back into the room for a while.

7   Q    "He" being -- just to be clear, which defendant?

8   A    Phil.

9   Q    Okay.

10  A    And he then opens the door, and he's in the room.  And

11  he's in the room, and there's a bag laying on the bed and it's

12  open.  The suitcase is actually laying open.  And he's standing

13  next to it.  And --

14  Q    And what did you do at that point?

15  A    And I said, "Is that your suitcase?"  And he said, "Yes."

16  And I said, "Are you giving me permission to search it?"  And

17  he goes, "Yes."  I said, "Well, can I come into the room to

18  search your suitcase?"  And he said, "Sure."  So, I walked into

19  the room and searched his suitcase.

20  Q    What did you find?

21  A    Four pounds of methamphetamine hidden in the blue jeans

22  of -- his suitcase was packed very immaculate, and they were in

23  Tupperware containers slid up the pant legs.  And I could feel

24  them.  I looked at him; I said, "Is that yours?"  He said,

25  "Yes," and I placed him under arrest.

Small - Direct / By Mr. Baker                    9

1   Q    All right.  Turning to Mr. Cheun -- and I'm sure I'm

2   mispronouncing his name; I apologize for that.  But did you

3   interact with him as well while you were in the car?

4   A    Yes.

5   Q    And describe that for the Court.

6   A    There was a time where they both moving in and out of the

7   room on me, and he came out and asked a series of questions to

8   me about what was going on, and I asked permission to speak to

9   him and he gave me permission, and he said they were in Arizona

10  for a couple of days but they had driven to Arizona.  And I

11  asked him to see his I.D., and he brought his passport out.

12  And when he handed me the passport, in the passport was an

13  American Airlines ticket for January 26th flying from Phoenix

14  to -- no, from Chicago to Los Angeles.

15          So, I told him what was going on, and I asked for

16  permission to search his suitcase, and that's when Phil opened

17  the door and things got a little confusing.  Phil was in the

18  room; Anthony was in the hallway with me, and I searched Phil's

19  suitcase and arrested him.  Anthony asked me what was going on.

20  I said, "Your roommate's under arrest."  I said, "Do you have

21  any luggage with you?"  He goes, "Yes," and he pointed out a

22  bag.

23  Q    And did you obtain consent to search that bag?

24  A    Yes.  I searched it right in the room.

25  Q    What did you find?

Small - Direct / By Mr. Baker                    10

1   A     It was also well packed, but there was a large white sack

2   that was taped up very messy.  It was like somebody had done it

3   themselves.  And I said, "What is this?"  And he said it was --

4    I think I'm saying it right -- a geode?  I guess that's some

5   type of rock.  And there were some crystals that he bought his

6   mother.  And he -- I asked permission to search it, and he

7   would not give me permission to search it.

8   Q     What did you do at that point?

9   A     Based with the other things I saw in the room and the

10  conversation, I told my partner, Jay Perry, to go ahead and

11  handcuffed him also.  We transported both men back to the DEA

12  office.

13  Q     Had you also found the pipes at that point?

14  A     Yes, sir.  There was -- there were -- prior to finding the

15  geode, in fact, there was two pipes wrapped up in plastic like

16  they were just purchased to smoke either cocaine, marijuana,

17  or -- or methamphetamine.  And then there were also a butane

18  torch in his luggage that -- high -- like a high-intensity

19  torch to smoke -- in my training and experience, to smoke

20  illegal drugs.  And there was also another pipe laying open in

21  the room with another butane torch laying -- in the room.

22  Q     And having placed them under arrest, did you then execute

23  a search warrant?

24  A     Yes.  I came back to the office for the search warrant for

25  the white sack, and presented to the United States Magistrate

```
                    Small - Direct / By Mr. Baker                 11
```

1  Judge Scott, and he signed the warrant, and I executed the

2  warrant at the DEA office.

3  Q    What did you find?

4  A    Approximately a little over one kilo of methamphetamine

5  inside the white sack.

6  Q    All right.  And you field tested that?

7  A    Field tested both of them; received a positive reaction

8  for methamphetamine.

9  Q    So, positive for the -- the material found in

10 Mr. Maddaleni's suitcase, pant legs, and positive for the

11 material found in the white sack in Mr. Cheun's luggage.

12 A    That's correct.

13 Q    All right.  In your training, education, and experience,

14 are the quantities found in each of these suitcases consistent

15 with distribution?

16 A    Yes, they are.

17         **MR. BAKER:**  Your Honor, I'll pass the witness.

18         **THE COURT:**  Counsel, does defense -- do you have an

19 agreement as to who goes first with cross?

20         **MR. ROBBENHAAR:**  No, but I'm certainly willing to go

21 first --

22         **THE COURT:**  Do you want to flip a coin?

23         **MR. ROBBENHAAR:**  -- unless Mr. Tallon wants to go.

24         **THE COURT:**  Mr. Tallon, your witness.

25         **MR. ROBBENHAAR:**  Okay.

1                      **CROSS EXAMINATION**

2   **BY MR. TALLON:**

3   Q    Agent Small, did you have any particular suspicion as to

4   either of these two men before you knocked on the door of

5   Room D?

6              **MR. BAKER:**  Your Honor, I'm going to object.  That

7   doesn't go to the issue of probable cause.

8              **THE COURT:**  Sustained.

9   **BY MR. TALLON:**

10  Q    You said that you contacted an attendant on the car.  Is

11  that correct?

12  A    That's correct.

13  Q    And your question to her was what?

14  A    "Did you have any passengers board in Flagstaff?"

15  Q    And what time would those passengers have boarded in

16  Flagstaff?

17  A    I think it's about 5:00 o'clock in the morning.

18  Q    All right.  And what questions did you ask besides that

19  concerning the two men in Room D?

20  A    "Have you seen them?"

21  Q    And what did she say?

22  A    No, they had been in the room.

23  Q    And is there anything suspicious about that?

24             **MR. BAKER:**  Your Honor, same objection.  Doesn't go

25  to --

 1          **THE COURT:**  Sustained.

 2          **MR. BAKER:**  -- probable cause.

 3   **BY MR. TALLON:**

 4   Q    What happened after -- well, did you ask any other

 5   questions of the attendant?

 6   A    I asked if they had any luggage.

 7   Q    When you went down -- and what did she say in response to

 8   that?

 9   A    It was in their room.

10   Q    And is there an area in the car, in that sleeper car,

11   where you could store luggage outside of the room?

12   A    Well, they were in a very large room.  They were in the

13   largest room on the train.  It sleeps four people.  But there

14   was -- you could store luggage anywhere on a train.

15   Q    Okay.  And by "the largest," about how big is that room?

16   A    Well, it's the second largest, actually.  It's probably 10

17   to 12 feet long by 10 feet wide; has a toilet and a shower in

18   it; it has two beds that sleep four people.

19   Q    So, to use a toilet and a shower you don't have to leave

20   this room for any reason.

21   A    To eat.

22   Q    And what time do you first contact Room D?  What time of

23   day is it?

24   A    Probably 11:15.

25   Q    Now, when you knocked on the door, you said that

Small - Cross / By Mr. Tallon                    14

1   Mr. Maddaleni moved a drape to the side and saw you outside.

2   Did you -- did it appear that you had woken him up?

3   A    I couldn't tell.  It was pitch black in the room.  I

4   couldn't -- I couldn't even see the person.  I found out later

5   who it was.

6   Q    And did you have any idea at that point in time whether or

7   not Mr. Cheun was awake or asleep?

8            MR. BAKER:  Objection, your Honor.  This would go to

9   questions of consent to the search, which is not an issue in

10  the scope of a preliminary hearing.  It doesn't go to probable

11  cause.

12           THE COURT:  Sustained.

13  BY MR. TALLON:

14  Q    Well, at the time you spoke with Mr. Maddaleni, you said

15  that he opened the drape and then he came out the door.

16  A    Yes.

17  Q    And you said it was pitch black in the room, correct?

18  A    Yes.

19  Q    Could you see where Mr. Cheun was within the room?

20  A    No.

21  Q    Do you know whether Mr. Cheun was sleeping within the

22  room?

23  A    No.

24  Q    And, then, after you had a conversation with Mr. Maddaleni

25  in the hallway, Mr. Maddaleni went back into the room; is that

1    correct?

2    A    Yes.

3    Q    And I believe your testimony was he was in the room for

4    about another nine or ten minutes.

5    A    It was more like eight and a half, I think, minutes.

6    Eight and a half minutes.

7    Q    All right.  Were you tape recording this encounter?

8    A    Yes.

9    Q    And were -- was there another agent with you at that point

10   in time?

11   A    No.

12   Q    You were by yourself.

13   A    Yes.

14   Q    And where was Officer Perry, or Agent Perry, at the time

15   you first contacted Mr. Maddaleni?

16   A    They were back in the coach section of the train.

17   Q    All right.  A completely different car?

18   A    Yes.  They were at the other end.  I was at the front of

19   the train, and they were at the rear of the train.

20   Q    All right.  And there was another agent with you, Agent

21   Walsh?

22   A    No, he was with Agent Perry.  I was by myself.

23   Q    Okay.  I meant by -- the three of you were on this task

24   that day, that detail.

25   A    That's correct.

```
                    Small - Cross / By Mr. Tallon                 16
```

1  Q    Okay.  So, at any point during that eight and a half

2  minutes that you mentioned, did either one of those agents join

3  you at car -- excuse me -- at the Room D?

4  A    Yes.

5  Q    Okay.  So, when Mr. Maddaleni opened the door to contact

6  you again, who was present?

7  A    Just me.  I was by myself still.

8  Q    Okay.  And those two agents, neither of them had arrived

9  at that point.

10  A    That's correct.

11  Q    He closed the door and he stepped out in the hallway.

12  A    Yes.

13  Q    And how long did you speak with him in the hallway?

14         **MR. BAKER:**  Your Honor, I'm going to object to

15  relevance again.  We're not getting to the issue here.

16         **THE COURT:**  Sustained.

17  **BY MR. TALLON:**

18  Q    Did you use the -- describe that time period as about 35

19  seconds?

20  A    Well, he was in the hallway twice with me.  Once with just

21  his ticket; I asked to see his I.D. and he went back in the

22  room, and that's when he was in there about -- no, he came back

23  about 35 seconds with the I.D.; then he went back in the room a

24  third time and shut the door, and he was in there about eight

25  and a half minutes.

1  Q    That was -- so, he was in the room for about eight and a

2  half minutes after he closed the door the third time.

3  A    The -- well, yeah, second or third time.

4  Q    All right.  At the time he closes the door before this

5  eight-and-a-half-minute period, did you know who the other

6  occupant of the room was?

7  A    I believe I knew his name.

8  Q    I'm sorry?

9  A    I had an idea of the name.  I didn't know -- I hadn't

10  seen -- seen the person on the second time he went in the room.

11  Q    Okay.  Did you have the I.D. of the name of the second

12  occupant of the room because of information you got from the

13  attendant?

14  A    No.

15  Q    How did you have that information?

16        **MR. BAKER:**  Your Honor, I object again; same

17  objection.

18        **THE COURT:**  Sustained.

19        **MR. TALLON:**  Well, it goes to identity, your Honor.

20        **THE COURT:**  You can argue, but it doesn't go to

21  probable cause.  Sustained.

22  **BY MR. TALLON:**

23  Q    What was the source of your information as to the other

24  occupant of the room?

25  A    It was a confidential source.

1              THE COURT:  Counsel, I just sustained the objection.

2              MR. TALLON:  I thought I -- I asked a different

3      question, Judge.

4              THE COURT:  I don't think you did.  I think you asked

5      the same question.

6      BY MR. TALLON:

7      Q    So, after this eight-and-a-half-minute period the door

8      opens again, and who was present inside the room?

9      A    I still can't see inside the room.  The drapes are shut.

10     Anthony comes out of the door.  And this isn't the first time

11     I've seen him.

12     Q    Okay.

13     A    And he walks up to me, and I ask if I could speak to him.

14     Q    Are you in the hallway?

15     A    Yes.

16     Q    And you asked if you could speak to him, and then what did

17     he say?

18     A    He said, yeah, I could speak to him.

19     Q    And did you identify yourself before you asked him to

20     speak with you?

21     A    Well, I was -- when I first talked to Mr. Maddaleni, if

22     I'm saying that correctly, I was speaking loud enough whoever

23     was in that room could hear what I was doing.  So -- and my

24     badge was out around my neck.  So, I -- I made the assumption

25     everybody heard that I was a police officer, and then I -- when

1  he walked out, he -- him and I were talking.  I asked, "Can I

2  speak to you for a moment?"  He said yes.

3  Q    All right.  You made an assumption.  Do you know whether

4  or not Mr. Cheun was awake during any of that period of time

5  prior to his walking out of the room?

6          **MR. BAKER:**  Your Honor, same objection.

7          **THE COURT:**  Sustained.

8  **BY MR. TALLON:**

9  Q    Okay.  After you speak with Mr. Cheun, you asked if you

10 could speak with him, and what did you speak about?

11 A    His trip.

12 Q    And what -- tell me the details of that conversation.

13 A    I said, "Where are you coming from?"  He said, "Arizona."

14 He said they had been out to buy a car, and they didn't find a

15 car, so they were headed home.  I said, "Well, how did you all

16 get to Arizona?"  He said, "We drove."  And I asked him if he

17 had his I.D. with him, and he went back into the room and got a

18 passport and brought it out to me.

19 Q    And did the passport seem to be in order?

20 A    It was.

21 Q    And you --

22 A    I was just looking for the passport to see his name, see

23 if his -- he had his name on something.

24 Q    Okay.  And this conversation is taking place in the

25 hallway; where is Mr. Maddaleni at that time?

Small - Cross / By Mr. Tallon                          20

1   A    In the room.

2   Q    Had he opened his suitcase for your inspection at that

3   point?

4   A    No, sir.

5   Q    Okay.  So, after you speak with Mr. Cheun, after that

6   conversation is over, what's the next action you take?

7   A    He's showing me the passport, and about -- we're standing

8   in the hallway.  About that time the door opens and

9   Mr. Maddaleni is standing in the room with the suitcase open.

10  Q    And you went in to search it?

11  A    Right.  I asked him if I could come in and I searched it.

12  Q    And where was Mr. Cheun while you were in the room

13  searching the suitcase?

14  A    Right at the door, in the hallway.

15  Q    Were there any other agents present at that point?

16  A    Right about -- just a few minutes before the door is

17  opened, I had earlier called Jay Perry and John Walsh and asked

18  them to come join me back in the room.

19  Q    Okay.  Was there a reason that you called them to join you

20  at that time?

21  A    Yes.

22  Q    What was that?

23  A    I felt something was -- criminal activity was afoot, and

24  there was two of them and just one of me, and I wanted someone

25  else there.

 1  Q    Okay.  Can you articulate why you believed criminal

 2  activity was afoot?

 3            **MR. BAKER:**  Your Honor, that goes to reasonable

 4  suspicion and not to the issue of ultimate probable cause for

 5  the criminal complaint.

 6            **THE COURT:**  Sustained.

 7  **BY MR. TALLON:**

 8  Q    How long did the search of -- okay.  Where did the two

 9  agents that came to join you, where did they position

10  themselves when they arrived?

11  A    Down the hallway.  Agent Perry was out of sight; John

12  Walsh was standing right next to me.

13  Q    Standing next to you inside the room?

14  A    No, no.  He never went in the room.  I only went in the

15  room.  He was in the hallway keeping an eye on Mr. Cheun while

16  I went in the room.

17  Q    Was Mr. Cheun cuffed at that time?

18  A    No, sir.  He was not.

19  Q    And how long did the search of the bag take, the suitcase,

20  Mr. Maddaleni's suitcase?

21  A    Maybe five seconds.

22  Q    Five seconds?

23  A    There was -- the methamphetamine was right on top in his

24  pants.  It was pretty simple.

25  Q    Okay.  And you said it was immaculately packed.

Small - Cross / By Mr. Tallon                22

1   A    Yes, sir.

2   Q    What other items or objects were inside that suitcase?

3   A    Numerous articles of clothing.  He had a dress shirt,

4   shoes; just -- all his pants were very nice; all his clothes

5   were very nice, he had dress shoes, and it looked like

6   everything had a place in the suitcase.

7   Q    Okay.  Were they brand new?  Did they appear to be brand

8   new?

9   A    Not everything.  There were some things he had purchased,

10  toiletry items, colognes and stuff, but the clothes I don't

11  think were new.  They were mid condition.

12  Q    Okay.  So, were there any clothes in there with any price

13  tags on them?

14  A    There may have been one or two.

15  Q    And it's your testimony that the pants within which the

16  Tupperware containers were found were right on top of the

17  suitcase when it was opened on the bed.

18  A    Yes, sir.

19  Q    Okay.  And this took five seconds to make this

20  determination.  You didn't perform a field test at that point,

21  did you?

22  A    No, sir.

23  Q    But did you personally cuff Mr. Maddaleni?

24  A    No, sir.

25  Q    Who did?

Small - Cross / By Mr. Tallon                                      23

1    A    John Walsh.

2    Q    And when Mr. Walsh -- at that point in time did Agent

3    Perry join?

4    A    I couldn't say -- see.  I was inside the room, and all I

5    could see was the door, and John Walsh was watching for my

6    safety, and I told him to go ahead and cuff -- cuff him.

7    Q    Okay.  When you said that you had -- earlier, that you had

8    a belief that some criminal activity was afoot, was that

9    criminal activity as to Mr. Maddaleni or criminal activity as

10   to Mr. Cheun?

11               **MR. BAKER:**  Your Honor --

12               **THE COURT:**  Sustained.

13               **MR. BAKER:**  -- same objection.

14   **BY MR. TALLON:**

15   Q    Did this cuffing of Mr. Maddaleni take place in front of

16   Mr. Cheun?

17   A    Yes, it did.

18   Q    And he was in the hallway when it took place?

19   A    Yes.

20   Q    And what was the next action you took?

21   A    I turned to him; I said, "Your friend is under arrest."

22   Q    Did you tell him what he was under arrest for?

23   A    I said he had some drugs in his suitcase, I believe.

24   Q    What was the very next thing you did?

25   A    I asked him, I said, "Do you have any luggage with you?"

1    And he pointed to a suitcase that was further back in the room.

2    Q    And what color was that suitcase?

3    A    Gray.

4    Q    And were there any other items of luggage that you seized

5    from Mr. Cheun that day?

6    A    After he was arrested we took a backpack that we turned

7    out -- found out later was his; we didn't know it at the time.

8    Q    Can you describe that backpack?

9    A    It was -- I think it's blue, like a student's backpack.

10   It had his school I.D. in it.

11   Q    Did you search that backpack?

12   A    Incident to arrest, yes, sir.

13   Q    Were there any items of concern or -- inside that

14   backpack, contraband or otherwise?

15   A    Not that I recall.

16   Q    Anything -- nothing notable?

17   A    No, sir.

18   Q    All right.  Within the gray suitcase, can -- did the

19   suitcase, the gray suitcase, did that appear to be a new piece

20   of luggage?

21   A    Yes, sir, it did.

22   Q    Brand new?

23   A    It appeared to me to be brand new.

24   Q    And within that gray suitcase, what items did you find

25   besides this large white bag?  Let's put that aside for a

1   moment.  What else was in that gray, brand new suitcase?

2   A    Well, there was some of Mr. Maddaleni's clothes, because

3   Mr. Cheun told me that.  He goes, "He put some of his clothes

4   in my suitcase."  And there was a couple more geodes.  I think

5   I'm saying that correctly; these rock things.  They were

6   wrapped up in wrapping paper.  And he told me, "You can go

7   ahead and search those," and I didn't know what a geode was,

8   and we talked -- I said, "What is a geode?"  I didn't know what

9   it was.  And he opened them up and there was these rocks; he

10  opened it up; they're like crystals on the inside.  And he said

11  he bought them for some friends or something.  And he also had

12  some -- well, there was some bath salts that you -- you know,

13  the soft -- you take a bath with, softens the water, and he had

14  the butane torch.  I can't think of the --

15  Q    Bath salts in a bag?

16  A    They weren't in the bag.  They were just laying in the

17  suitcase.

18  Q    Okay.  You mentioned that some of Mr. Maddaleni's clothes

19  were in that suitcase; is that right?

20  A    That's what he told me.  I couldn't tell whose clothes

21  were whose.

22  Q    Were there clothes with price tags on them in that

23  suitcase?

24  A    There may have been.

25  Q    May have been?

1   A     I think --

2   Q     Can you be more clear?

3   A     There was some -- one of the two suitcases had price tags;

4   sitting here today I couldn't tell you which one had them.

5   Q     Could both of them have had price tags -- clothes with

6   price tags in them?

7   A     It could have been.

8   Q     Okay.  So, we have the clothing.  Some of that clothing is

9   Mr. Maddaleni's.  Did you identify any of the clothing in the

10  gray suitcase as being Mr. Cheun's clothing?

11  A     No.  I wasn't looking at sizes or anything.  I was just

12  searching for contents of the bag.

13  Q     And the butane torch you referred to, that appeared to be

14  a new item?

15  A     It appeared to be, to me, to be new.

16  Q     And the pipes that you referred to earlier, did they

17  appear to be new items?

18  A     Yes.  They were wrapped up in plastic.

19  Q     Would possession of those pipes, not having been used to

20  smoke drugs yet, new pipes, would that be, in and of itself,

21  illegal?

22  A     What I saw with the torches and what I saw in the room, I

23  thought it was drug paraphernalia.  I think it's illegal.

24  Q     Well, focusing on the pipes alone, say glass pipes could

25  be used to smoke several different kinds of drugs, but no

1   residue in them.  Is possession of those, in and of itself,

2   illegal?

3            **MR. BAKER:**  Your Honor, I'm going to object.  The

4   charge here is for the substantial quantity of methamphetamine

5   in the bags.  I don't see the relevance of -- of whether the

6   pipes were new, old, or indifferent.  We're really talking

7   about possession of a large quantity of drugs in suitcases that

8   each of the defendants identified as their own.  I'm not sure

9   what this gets to.

10           **THE COURT:**  Sustained.

11  **BY MR. TALLON:**

12  Q    Is there anything else in the gray suitcase that you have

13  not yet mentioned?

14  A    Yes.

15  Q    What?

16  A    I find it later, but it's the tape that was used to tape

17  up the white sack.

18  Q    And what kind of tape was that?

19  A    The -- I call it Scotch tape, but that's the brand name.

20  It's the invisible, clear tape that you wrap up your Christmas

21  gifts in.  And that white sack was all taped up, poorly, messy,

22  with this see-through tape.

23  Q    Poorly, messy, as if it was done hastily?

24  A    Yes.  And later on I found a -- I found the tape they used

25  to tape up that white sack.  It was in his -- Anthony's

1    suitcase.

2    Q    Do you know who taped up the white sack?

3    A    No, sir, I do not.

4    Q    Do you know when that white sack was taped up?

5    A    No, sir, I do not.

6    Q    When, during this sequence of searching -- okay, and what

7    I'm envisioning here -- let me back up a moment to frame this

8    question for you.

9            You're in the room and Mr. Maddaleni is in cuffs;

10   he's been arrested, cuffed by you, and taken aside by Agent --

11   Walsh?

12   A    Agent Walsh actually handcuffed him and walked him down --

13   handed him down the hallway to Agent Perry, who had control of

14   him.

15   Q    Okay.  So, during the search of the gray suitcase, was

16   Mr. Maddaleni present?

17   A    No, sir, he was --

18   Q    Or had he been removed?

19   A    He had been removed.

20   Q    All right.  Removed by Agent Perry.

21   A    Actually, been removed by Agent Walsh.  These hallways are

22   very narrow and you just don't move around in them.  So, you

23   hand things -- once he's cuffed, you hand him off to the next

24   officer; they didn't want to lose sight of me in the room.

25   Q    Okay.  So, you're certain that Mr. Maddaleni and Agent --

1   which agent?

2   A      Perry.

3   Q      -- Perry had been -- had removed themselves from the

4   doorway of the room, Room D, before you started searching the

5   gray suitcase?

6            MR. BAKER:  Objection.  Relevance, your Honor.

7            THE COURT:  Sustained.

8   BY MR. TALLON:

9   Q      When you were searching the gray suitcase, was Agent Walsh

10  present?

11           MR. BAKER:  Objection, your Honor.  Relevance.

12           THE COURT:  Sustained.

13  BY MR. TALLON:

14  Q      Was -- when did you cuff Mr. Cheun?

15  A      I did not --

16           MR. BAKER:  Objection, your Honor.  Relevance.

17           THE COURT:  Sustained.

18           MR. TALLON:  Your Honor, I think it has to do with

19  the issue of consent, your Honor.

20           THE COURT:  And that's a subject for another day.

21  We're here on the issue of probable cause.

22  BY MR. TALLON:

23  Q      Where was Mr. Cheun when you were searching his suitcase?

24           MR. BAKER:  Objection, your Honor.

25           THE COURT:  Sustained.

1    **BY MR. TALLON:**

2    Q    Did Mr. Cheun appear to have any reaction to Mr. Maddaleni

3    being arrested?

4              **MR. BAKER:**  Objection, your Honor.

5              **THE COURT:**  Overruled.

6              **THE WITNESS:**  Yes.

7    **BY MR. TALLON:**

8    Q    What was that reaction?

9    A    His reaction was, "What" -- "What has he done?"

10   Q    Did he ask you anything else?

11   A    He made a couple -- he actually walked into the room, and

12   he was talking about something.  I'll be honest with you; it

13   was happening kind of fast, and I can't remember right this

14   second everything he said to me.

15   Q    Okay.  But it was recorded.

16   A    Yes, sir.

17   Q    Did you -- after you found this white bag that you

18   described as messily taped up, hastily taped up, did you ask

19   Mr. Cheun if you could open it?

20   A    Yes, sir.

21   Q    And what did he say?

22   A    He didn't want me to rip it.

23   Q    Okay.  Did you open it?

24   A    No, sir.

25   Q    Okay.  So, he didn't actually say you couldn't open it; he

1    didn't want you to rip the bag.

2    A    That's correct.

3    Q    All right.  And -- and the reason you sought a warrant is

4    because you would have to rip it open to examine the interior

5    of it; is that right?

6    A    I -- the reason I got a warrant, he never gave me

7    permission to search it.

8    Q    Okay.  He didn't want you to rip it.

9    A    I look for the word "consent."  I never received it from

10   him, so there was no doubt he wasn't giving -- in my mind, that

11   I wasn't going to get permission to search it.

12   Q    Did he ever -- did he -- at any point in time did you ask

13   him, did you use the word, "Will you consent to my searching

14   this bag"?

15   A    Yes.

16   Q    And he says, "I don't want you to rip it."

17   A    That's right.

18   Q    Did he give you any other information about why he didn't

19   want you to somehow further examine that bag?

20   A    It was a gift for his mother.

21   Q    Any other reason?

22   A    No, he -- he did not talk to me much longer about it; he

23   talked to Agent Perry about it.

24   Q    What do you mean he talked to Agent Perry about it?

25   A    I handed the sack to Agent Perry.  I said, "Sir, this is

1    my partner.  Why don't you talk to him about the sack," because

2    we still had a -- I had a full suitcase still to search.  The

3    first thing I found when I opened the suitcase was this big

4    sack that was heavy as all get out.  And I asked him about

5    searching it; he said, "No, I don't want you to rip it."  I

6    said, "This is my partner.  Why don't you talk to him about the

7    sack," and I continued searching the suitcase.

8    Q    Was there any further discussion had between Mr. Cheun and

9    Mr. -- excuse me -- Agent Perry about the sack, about

10   consenting to the search of the sack?

11   A    Yes, sir.

12   Q    And what was that conversation?

13   A    We never got consent to search.  It was, "You can't --

14   there's geodes; there are crystals in there; they're gifts for

15   my mother."  It just kind of repeated itself.

16   Q    Okay.  And all of this is recorded also by Agent Perry?

17   A    I don't think his recorder was on.

18   Q    Was he talking to Mr. Cheun inside the room or in the

19   hallway?

20   A    Right at the doorway.

21   Q    Could you hear what was being said?

22   A    I could.

23   Q    Just can't remember the details?

24   A    It was just normal conversation about the sack and why he

25   had it.

Small - Cross / By Mr. Tallon                    33

1   Q    Okay.  But normal conversation about a sack that you

2   thought there was some criminal activity about; is that right?

3   A    Yes, sir.

4   Q    Okay.  So, how normal could that conversation be?

5   A    "Why do you have it?  What's in it?"  It was, like I said,

6   "It's for my mother; it's geodes."  "What are geodes?"

7   "They're rocks."  And he also said, "I bought my mother some

8   crystals, and they're wrapped up in there."

9   Q    Okay.  I'm not sure if I specifically asked you this, but

10  in the gray suitcase were any of the clothes in that suitcase,

11  did they have price tags on them as if they had been just

12  purchased and not worn?

13  A    Yes, you did ask me that.

14  Q    Okay.  And what was your answer again?

15  A    That I think there was some in that suitcase with price

16  tags on them.

17          **MR. TALLON:**  Could I have a moment, your Honor?

18          **THE COURT:**  Yes, sir.

19       **(Pause)**

20          **THE COURT:**  Counsel, will you put a question to the

21  witness, please, sir?

22          **MR. TALLON:**  Your Honor, I was just consulting

23  briefly with Mr. Robbenhaar as --

24          **THE COURT:**  I know.  The witness is awaiting, the

25  Court's awaiting, and everyone in the room is awaiting; if

Small - Cross / By Mr. Robbenhaar                    34

1   you'd please put a question to the witness.

2          **MR. TALLON:**  Okay.  I apologize, your Honor, and if I

3   might just respond, I just wanted to check with Mr. Robbenhaar

4   as co-counsel as to anything of significance that he felt I

5   should know.  I also spoke with Mr. Cheun concerning any

6   concerns he might have.  And at this point in time, your Honor,

7   I have no additional questions.  Thank you.

8          **THE COURT:**  Thank you.  Mr. Robbenhaar, your witness.

9                        **CROSS EXAMINATION**

10  **BY MR. ROBBENHAAR:**

11  Q    Agent Small, one of the first questions asked on direct

12  examination by Mr. Baker was:  How is it that these individuals

13  came to your attention?  And your response was, essentially,

14  that you had consulted with the attendant, the Amtrak

15  attendant.  And your question to the Amtrak attendant was:  Who

16  got on in Flagstaff?  That's what your testimony was.  Why did

17  you ask that question of the attendant?

18  A    I had reviewed an -- Amtrak reservations that day, earlier

19  in the day, and I remember seeing a reservation for two people

20  getting on in Flagstaff.

21  Q    And as opposed to getting on in Los Angeles, or Gallup, or

22  wherever, why, in your mind, is Flagstaff different?

23  A    It's -- the train -- the train service in Arizona is

24  unique.  There is a train through the southern part of the

25  state of -- Maricopa and Tucson, but it only goes three days a

 1  week, so if you want to come out of Tucson or Phoenix on a

 2  quicker train, you come up to Flagstaff.  It's a bus

 3  connection, and you get on in Flagstaff, and that train runs

 4  seven days a week.  So, that's -- Flagstaff has always been

 5  interest to us because it's a get-on point for a lot of people

 6  coming out of Tucson and Phoenix.

 7  Q    All right.  Upon your review of the -- I guess it was a

 8  passenger manifest or some paperwork from Amtrak, you certainly

 9  came across the names of Mr. Cheun and Mr. Maddaleni?

10  A    Yes, sir.

11  Q    And did you determine from that document how and when

12  and -- how and when the tickets were purchased?

13  A    Yes, sir.

14  Q    And what did you learn?

15  A    Bought the tickets prior -- I think on the 24th of January

16  with Mr. Maddaleni's credit card.  He left his home address in

17  Madison, Illinois -- Addison, Illinois, and it was a one-way

18  ticket from Flagstaff, Arizona, to Chicago.

19  Q    So, these were not purchased in cash on the same day.

20  A    No, sir.

21  Q    All right.  Now, your subsequent testimony concerned when

22  you first contacted Mr. Maddaleni, and essentially he had given

23  you his printed ticket; is that correct?

24  A    Yes.

25  Q    And you subsequently requested identification?

```
                 Small - Cross / By Mr. Robbenhaar              36
```

1    A    Yes, sir.

2    Q    Were you holding the ticket while he went and got his

3    identification?

4              **MR. BAKER:**  Objection, your Honor.  This goes to

5    reasonable suspicion rather than probable cause.

6              **THE COURT:**  Sustained.

7    **BY MR. ROBBENHAAR:**

8    Q    You described in your testimony several -- I think two or

9    three trips back into the room, the door closes, and

10   Mr. Maddaleni returns to provide you information that you

11   request.  You then described in your testimony, sir, that

12   Mr. Maddaleni provided consent to search his -- his luggage.

13   A    That's correct.

14   Q    How was that -- can you describe more fully how that

15   consent was obtained?

16             **MR. BAKER:**  Objection, your Honor.

17             **THE COURT:**  Sustained.

18             **MR. ROBBENHAAR:**  Your Honor, these are questions

19   directly asked by the prosecutor in his opening -- I mean in

20   his direct.  I mean, if he opens the door to these, this line

21   of questioning, we should have a chance to respond.

22             **THE COURT:**  Thank you, Counsel.  Sustained.

23   **BY MR. ROBBENHAAR:**

24   Q    Agent, who is the attendant that you spoke to?

25   A    Her first name is Peggy.  I don't know her last name.

Small - Cross / By Mr. Robbenhaar                    37

1   Q    You know her by first name, Peggy?

2   A    She had a nametag.

3   Q    Had you ever dealt with her before?

4   A    No, sir.  Well, I see them all the time, but I -- I don't

5   remember ever dealing with her in the past.

6   Q    Is she the individual that alerted you or gave you the

7   passenger manifest, or is that from someone else?

8   A    It's not the same person.

9   Q    Not the same person?  Was that something you get on line,

10  or is that a -- you have to go physically to the Amtrak station

11  to get that manifest?

12  A    No, I don't go to the station to get that.

13  Q    Okay.  Is that an individual that gives you that

14  information?

15  A    Yes.

16  Q    Is that individual employed in any fashion by DEA?

17          **MR. BAKER:**  Your Honor, I'm going to object.  This

18  doesn't go to probable cause.

19          **THE COURT:**  Sustained.

20          **MR. ROBBENHAAR:**  Those are all the questions I have,

21  Judge.

22          **THE COURT:**  Is there any redirect?

23          **MR. BAKER:**  No, your Honor.

24          **THE COURT:**  May this witness be excused?

25          **MR. BAKER:**  He may, your Honor.

1          **THE COURT:**  Thank you, sir.  You may step down from

2    the witness stand.  You are excused from the proceedings.

3       **(Witness stepped down)**

4          **THE COURT:**  Does the Government have further evidence

5    or testimony?

6          **MR. BAKER:**  No, your Honor.

7          **THE COURT:**  Does defense counsel have any evidence or

8    testimony it wishes to put forward on the issue of probable

9    cause?

10          **MR. ROBBENHAAR:**  Not on behalf of Mr. Maddaleni.

11          **MR. TALLON:**  Not with respect to Mr. Cheun.

12          **THE COURT:**  Thank you, Counsel.

13          The Court has considered the affidavit attached to

14   the complaint, the testimony presented here this morning, and I

15   conclude that there -- conclude and find that there is probable

16   cause to believe that offenses were committed and that these

17   defendants committed them.

18          Mr. Tallon, you indicated you wished to speak to the

19   conditions of release.  You may proceed.

20          **MR. TALLON:**  Your Honor, Pretrial Services has

21   prepared a report and believes that conditions are available or

22   could be fashioned to manage the risk of nonappearance by

23   Mr. Cheun.  I recognize that there is a presumption because of

24   the penalties that relate to the crime charged at this point, a

25   presumption that Mr. Cheun should be detained, but I would ask

1    the Court to consider these factors to rebut those

2    presumptions, or that presumption.

3            Mr. -- excuse me -- Mr. Cheun has absolutely no

4    criminal history.  He has a very stable family.  He's lived at

5    the same address with the same parents and with some siblings

6    for virtually his entire life.  All of the information that was

7    provided to Pretrial Services by Mr. Cheun with respect to his

8    background I believe has been verified, based upon my reading

9    of the Pretrial Services report.

10           Mr. Cheun is -- it's indicated that he lacks

11   employment, but he's basically on a -- he's on a break, very

12   brief break, that is related to the departure of a program

13   director in the area that he's working.  He's been, for most of

14   the last year or two, employed in a hospital setting combined

15   with attending a physician's assistant school.

16           The conditions that are suggested by Pretrial

17   Services is that he shall report regularly to them.  I won't

18   read all the conditions; they're basically some standard

19   conditions.  And I would ask that Mr. Cheun be allowed to

20   remain free subject to those conditions to return to his home,

21   to return to the educational program that he's currently

22   engaged in.  I think he's very likely to resume employment at

23   the same time that he attends school.  He also has some health

24   issues that are not managed particularly well in a custody

25   situation that I think are also a factor that -- you know, is

1    in favor of his being released on conditions, your Honor.

2              So, I'd ask the Court to consider the reports, my

3    comment -- excuse me -- the contents of the report, my comments

4    in relation to its consideration of whether or not this

5    rebuttable presumption has been overcome in this case.  Thank

6    you.

7              **THE COURT:**  Thank you, Counsel.

8              Does the Government wish to be heard?

9              **MR. BAKER:**  Yes, your Honor.  The United States seeks

10   detention.  I don't believe that anything Mr. Tallon has

11   described overcomes the presumption in favor of detention here.

12   While Mr. Cheun may not have a criminal history, this is

13   certainly quite an adventure into the criminal justice system

14   with 1.6 kilograms of methamphetamine in a train car with

15   another passenger who had four pounds of methamphetamine in his

16   bag.  I don't see that seeing someone transporting that kind of

17   quantity of a very serious drug could be viewed as anything

18   other than a danger to the community.  The presumption is

19   justified in this case.  He should be detained.

20             In addition, I believe that, particularly in light of

21   the serious penalties that this defendant faces, he poses a

22   flight risk and also should be detained on that basis.

23             **THE COURT:**  Thank you, Counsel.

24             I did receive, read, and take judicial notice of the

25   Pretrial Services report.  They don't consider the presumption

1   in their recommendations, but the Court does, and I agree with

2   the arguments propounded by the Government.  I am going to

3   remand him back to the custody of the marshal over Mr. Tallon's

4   objection.

5           Mr. Robbenhaar.

6           **MR. ROBBENHAAR:**  Thank you, Judge.

7           **THE COURT:**  Yes, sir.

8           **MR. ROBBENHAAR:**  I've had a chance to review the

9   Pretrial Services report with -- with my client, Judge.  May

10  Mr. Baker and I briefly approach, your Honor?

11          **THE COURT:**  You may.

12          **MR. ROBBENHAAR:**  Thank you, Judge.

13      **(Sidebar began at 10:21 a.m.)**

14          **MR. ROBBENHAAR:**  Your Honor --

15          **THE COURT:**  Yes, sir.

16          **MR. ROBBENHAAR:**  -- I apologize for being late this

17  morning.  I was in the hallway.

18          **THE COURT:**  No, you don't have to.

19          **MR. ROBBENHAAR:**  No, and the reason is because I was

20  alerted by my client also, but then the marshals came up to me,

21  and they have -- Agent Small brought in all my client's

22  medication.  He's HIV positive, and he doesn't want that

23  information broadcast publicly.  So, I guess what I'll just do

24  is refer to his health condition.  But I want to try to get

25  that med -- the meds over to Sandoval, and their policy

42

1   generally is they can't accept medicine other than the

2   prescribed, you know, by the Sandoval County medical staff.

3   So, we're in a bit of a quandary.  I did get a release signed

4   by my client, but just I wanted the Court to know that this is

5   a very, very serious condition.

6          He's been off of his cocktail -- he's been on it for

7   years, but the last time he took it was Tuesday night, and

8   apparently if you get off of it for more than a few days your

9   body will then subsequently reject the meds, so it's imperative

10  that we get him meds, like, ASAP.  It's Friday.  So, I wanted

11  just to bring that up privately with the Court and Mr. Baker.

12         **THE COURT:**  Okay.  I don't know that I've got a

13  solution for you, Mr. Robbenhaar.

14         **MR. ROBBENHAAR:**  No, I know, and I've -- I've been in

15  communication with the marshals service, and we're going to try

16  to get Sandoval County to get in touch with the Chicago

17  doctors.  So, we're working on that, but I just wanted to --

18         **THE COURT:**  Okay.  Well, just --

19         **MR. ROBBENHAAR:**  -- you to know what I'm referring

20  to.

21         **THE COURT:**  Just say his prescriptions.

22         **MR. ROBBENHAAR:**  Yeah.

23         **THE COURT:**  Okay.

24         **MR. ROBBENHAAR:**  Thank you, Judge.

25         **THE COURT:**  Thanks.

43

1          **(Sidebar concluded at 10:23 a.m.)**

2          **MR. ROBBENHAAR:**  Thank you, Judge.

3          Your Honor, the -- the greatest concern I have with

4    Mr. Maddaleni's detention is his health conditions and the

5    prescriptions that he needs to be taking.  He last took his

6    medication Tuesday evening, and his arrest occurred in this

7    matter around noonish, I would say, on Wednesday, so it's been

8    a few days.  It's imperative that he gets that medication

9    immediately.  I have been in touch with the marshal on this

10   matter, and, hopefully -- unfortunately, Agent Small came in

11   with  his -- my client's medication, but, based upon my

12   experience, the jail will not accept out-of -- medication from

13   out of custody; it has to be prescribed in custody.

14          I just bring this to the Court's attention because

15   it's imperative that my client get his medication immediately.

16   I'll be working closely with the marshals.  In the event my

17   client remains in custody, I'd ask the Court to consider

18   releasing my client to the halfway house.  I understand that

19   detention is recommended by Pretrial Services, but I think my

20   client's medical condition is not something that can be

21   adequately managed by the jail at this time.

22          Thank you, Judge.

23   //

24   //

25   //

44

1              **THE COURT:**  Thank you, Counsel.

2              The Court has read, received, and takes judicial

3    notice of the Pretrial Services report, and based on the

4    presumption and his long history and failure to appear, I'm

5    going to remand him to the custody of the marshal.

6              I don't really have -- and when we -- this comes up

7    routinely with medications that someone has in their possession

8    but the prescription becomes a problem for the detention

9    facility, and I think you're doing all that you can.  Agent

10   Small has appeared with the medication, and I appreciate that

11   very much, but I also understand the policy of the detention

12   center, and I think if you continue to speak directly down in

13   the basement with the marshals service, and perhaps they can

14   make a call to the physician that prescribed the medication and

15   a new prescription could be faxed or e-mailed to the proper

16   location at the detention facility, maybe it can be done that

17   way.  But I don't pretend to be an expert on how that's done;

18   that's just my concept of what might be done.

19             **MR. ROBBENHAAR:**  I have a release signed by my

20   client, so I'll get that to Ms. Boyden (phonetic) at the

21   marshals service this morning right away when I get back to my

22   office, Judge --

23             **THE COURT:**  All right.

24             **MR. ROBBENHAAR:**  -- so, hopefully, we can --

25             **THE COURT:**  Thank you.

1          **MR. ROBBENHAAR:**  -- we can --

2          **THE COURT:**  Well, you're doing all that you can, and

3    I appreciate it.

4          **MR. ROBBENHAAR:**  Thank you, Judge.

5          **THE COURT:**  We'll be in recess.  He's remanded to the

6    custody of the marshal.

7       **(This proceeding was adjourned at 10:25 a.m.)**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

### CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    <u>September 17, 2014</u>

          Signed                                            Dated

          *TONI HUDSON, TRANSCRIBER*