# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

v.                                              1:14-cr-00415-JAP-2

**PHILIPP MADDALENI** and
**ANTHONY CHEUN**,

      Defendants.

## MEMORANDUM OPINION AND ORDER

On June 4, 2014, Defendant Anthony Cheun filed a FIRST MOTION TO SUPPRESS

EVIDENCE SEIZED ON JANUARY 29, 2014, AND MEMORANDUM IN SUPPORT

THEREOF BY ANTHONY CHEUN ("Motion to Suppress") (Doc. No. 37). On August 26,

2014, Plaintiff United States of America filed a RESPONSE IN OPPOSITION ("Response")

(Doc. No. 49). On September 8, 2014, Cheun filed a REPLY TO RESPONSE ("Reply") (Doc.

No. 53). On September 23, 2014, the Court conducted an evidentiary hearing on Cheun's

Motion. The Court will DENY Defendant's Motion to Suppress.

## FACTUAL BACKGROUND

Defendant Phillip Maddaleni and his co-defendant Anthony Cheun were arrested and

charged with possession with intent to distribute more than 500 grams of methamphetamine or

its salts and isomers and conspiracy after DEA Agent Kevin Small ("Agent Small") searched

Defendants' bags on an Amtrak train stopped in Albuquerque. Defendants were traveling from

Flagstaff, Arizona, to Chicago, Illinois. Agent Small boarded the train while his colleagues, Task

Force Officer Walsh and DEA Agent Perry, canvassed buses in the adjacent greyhound terminal.

Agent Small decided to question Maddaleni and Cheun after consulting Amtrak records which

showed Mssrs. Maddaleni and Cheun had purchased one-way tickets from Flagstaff to Chicago in sleeper berths five days before the train's departure.

Agent Small knocked on Defendants' berth and Maddaleni answered the door. Agent Small was wearing plain clothing, with his service weapon, handcuffs, and other police accoutrement concealed beneath his un-tucked shirt. Agent Small identified himself as a police officer and displayed his badge. When Agent Small asked Maddaleni if he could ask him a few questions, Maddaleni said yes, but asked Agent Small to wait while he went back into the cabin to put on his shirt. Maddaleni closed the door behind him.

When Maddaleni returned about a minute later, Agent Small asked where he was going and asked to see his train ticket. Maddaleni said he was traveling from Flagstaff to Chicago with Cheun. He went back into the berth to retrieve his ticket, closing the door once more. The parties dispute what a recording indicates Agent Small said after Maddaleni closed the door: according to the United States, Small said: "Leave the door shut. He won't open the door. That's all right." Response at 4. According to the Defendant, Agent Small said, "What the!—lave [sic] the door shut—you want to open the door?" Motion to Suppress at 2.

When Maddaleni re-opened the door less than a minute later, Agent Small asked him for his identification, which he produced. Maddaleni said he had flown from Chicago to Phoenix. Agent Small asked Maddaleni if he would consent to a search of his bags. Maddaleni agreed but asked if he could use the bathroom first. Agent Small agreed, and Maddaleni closed the door to the berth once more.

Four minutes later, Cheun opened the door. Agent Small halted a conversation he was having with a nearby couple and asked Cheun if he would speak with him. After Cheun said he was willing to talk, Agent Small asked Cheun about his itinerary, the purpose of his travel, and

whether he was traveling with Maddaleni. Cheun acknowledged Maddaleni was his traveling partner and said, contrary to Maddaleni's story, that they had driven from Chicago to Phoenix in order to purchase a car. Agent Small asked Cheun for his passport, and Cheun returned to the berth to retrieve it. His suspicions aroused, Agent Small called Agent Perry and Officer Walsh and asked them to join him.

After examining Cheun's passport, Agent Small asked for consent to search his bags. Cheun said he would allow Agent Small to search his bags, but asked Agent Small to provide a reason. Agent Small told Cheun the same thing he told Maddaleni: he was randomly speaking with people on the train, both in coach seating and in sleeper births. Just as Cheun was agreeing to let Agent Small search his bag, Maddaleni reappeared and invited Agent Small into the berth to search his bag. Officer Walsh was directly behind Agent Small in the hallway at this time, and Cheun was in front of them near the entrance to his and Maddaleni's berth. Agent Small walked past Cheun into the berth to search Maddaleni's bag. After Small discovered "packages of what appeared to be…a controlled substance," Response at 8, he ordered Maddaleni to go into the hallway, where Officer Walsh arrested him and took him off the train.

Agent Small returned to the hallway and told Cheun that Maddaleni was under arrest. Agent Small then asked Cheun if he had any bags. After Cheun identified his bag, Small again asked Cheun whether he had any contraband in the bag. Cheun said he had no contraband and that he would let Agent Small search the bag. After Agent Small told Cheun to move away from the bag, Cheun asked one of the officers (either Agent Small or Officer Walsh), "What did you find in his [Maddaleni's] bag? I thought he was doing something crazy."

Agent Small again asked Cheun whether he had permission to search his bag. Cheun responded, "Yes, yes" or "Yes, sir." Agent Small then searched Cheun's bag. Agent Small found

3

a wrapped package in Cheun's suitcase and asked what it was. Cheun said it contained geodes he intended to give to his mother as gifts. Agent Small asked Cheun whether he had permission to open the wrapped package. Cheun replied that he did not want Agent Small to "rip" the package. Agent Small asked Cheun to explain what a geode is several times, but did not open the package. Agent Small then told Cheun to stand back and talk with Agent Perry while he continued the bag search. Perry asked Cheun questions about geodes while Agent Small continued to search the bag.

During the course of the search, Agent Small found opaque tubes Cheun said contained bath salts. Some of these tubes were later found to contain methamphetamine. But Agent Small, at the hearing on Cheun's Motion to Suppress, said he thought the tubes actually contained bath salts (not illegal drugs) and that Cheun had been smoking them; hence his muttered remark (audible on Agent Small's belt recording) that Cheun and Maddaleni were "smokin' the bath salts."[1]

After a few minutes, Agent Small asked Cheun whether a black computer bag in the Defendants' berth (which contained glass pipes with residue on them and a butane torch) was his. Cheun disclaimed ownership of the bag; Agent Small searched it. Agent Small then asked for Cheun's consent to search a box found elsewhere in the room. Agent Small then arrested Cheun without having found any drugs in his personal effects but based on the drug paraphernalia in the cabin. After taking Cheun and his belongings off the train and to a DEA office, Agent Small had a trained dog sniff the package Cheun had refused to allow Agent Small

---

[1] "Bath salt" is actually a street term for synthetic cathinones, designer drugs chemically similar to khat, a Schedule I controlled substance. *See* NATIONAL DRUG INTELLIGENCE CENTER, U.S. DEP'T. OF JUSTICE, SYNTHETIC CATHINONES (BATH SALTS): AN EMERGING DOMESTIC THREAT 3 (July 2011), *available at* http://www.justice.gov/archive/ndic/pubs44/44571/44571p.pdf. Defendants have not been charged with possession of synthetic cathinones.

to search. The dog alerted to the wrapped package. Agent Small then obtained a search warrant

for the package, opened it, and found a large amount of methamphetamine inside.

## DISCUSSION

### a.  Whether Cheun freely consented to the bag searches

"[T]he Fourth Amendment permits police officers to approach individuals at random

in…public places to ask them questions and to request consent to search their luggage, so long as

a reasonable person would understand that he or she could refuse to cooperate." *Florida v.*

*Bostick*, 501 U.S. 429, 431 (1991). Courts in the Tenth Circuit look to the following "non-

exclusive" factors to determine whether a reasonable person would believe he or she could not

refuse to cooperate with a police officer's requests:

1) The physical context of the encounter, especially whether the encounter took place in the presence of other civilians;
2) Physical restraints (if any);
3) Whether the police are in plain clothes or are uniformed;
4) Whether the officers' service weapons are visible;
5) The number of officers present, their demeanor and tone of voice;
6) Whether and for how long officers retain the defendants' personal effects or identification;
7) Whether the defendant was advised of his right not to cooperate.

*United States v. Thompson*, 546 F.3d 1223, 1226 (10th Cir. 2008). After reviewing the record as

a whole, as well as testimony from Agent Small, Cheun, and a private investigator hired by

Cheun, the Court makes the following conclusions as to each factor:

*The physical context of the encounter*. Cheun was in the hallway outside his berth on the

second-floor of an Amtrak sleeper car for the entirety of his encounter with Agent Small.

Throughout the encounter, Agent Small's partner (either Officer Walsh or Agent Perry) stood

between two and nine feet behind Agent Small. The train carriage has three exits: one that leads

directly outside the train via some stairs, and two at either end of the second floor leading to

adjacent cars. Agent Small and his partner blocked Cheun's access to both exits to the South, but there was a door on the North end of the sleeper car.

The parties dispute whether Cheun could exit the train by going North. Agent Small testified that the North transition exit led to a combined sleeper/baggage car that passengers had access to. Raymond Torres, an investigator Cheun hired, went to the Amtrak station recently and saw a baggage car to the North of Defendants' carriage, and said was no way to enter that car from the sleeper carriage. Cheun testified that the only exit he knew about was the exit down the stairs to the South.

The Court will credit Agent Small's testimony that Cheun could have exited the train by going to the car to the North. Raymond Torres had no personal knowledge of the train's configuration on the day of Cheun's arrest when he testified. Therefore, his testimony about the train's configuration on that day is based entirely on speculation. Cheun's testimony that he did not know of the exit to the North is irrelevant evidence of his subjective state of mind during the encounter. *United States v. Abdeni*, 361 F.3d 1282, 1292-93 (10th Cir. 2004).

The Court concludes that this factor indicates a reasonable person would have felt free to refuse to cooperate with Agent Small. Although the hallway of the train car was cramped, two of Cheun's three exits were blocked, and there was another officer present, the Court finds these facts are outweighed by the presence of other persons (the unidentified couple next-door) and the fact that the encounter took place in the hallway, not inside Cheun's berth.

*Physical restraints, if any*. There is no evidence Cheun was physically restrained prior to his arrest. Therefore, this factor indicates a reasonable person would have felt free to refuse to cooperate with Agent Small on this ground.

*Whether the police are in plain clothes or are uniformed.* Cheun testified that he saw Officer Walsh's gun holster and handcuffs on his belt when he appeared behind Agent Small in the hallway of the train car. Cheun did not dispute Agent Small's testimony that his service weapon and handcuffs were concealed throughout the encounter, nor did he dispute Agent Small's testimony that he wore blue jeans, a baseball cap, and a casual shirt. The Court concludes that under this factor, a reasonable person would feel free to refuse to cooperate with Agent Small without any consequences.

*Whether the officers' service weapons are visible.* The Court finds that the Officers' service weapons were not visible during the encounter. Therefore, under this factor, a reasonable person would feel free to terminate the encounter.

*The number of officers present, their demeanor and tone of voice.* Two officers were present more or less throughout the encounter leading to Cheun's arrest. Agent Small and Agent Perry, the two officers who spoke with Cheun, spoke in professional tones of voice and were not aggressive or pushy. After Maddaleni's arrest, Agent Small assumed a more authoritative stature and began phrasing his questions arguably as demands instead of requests. But Cheun's first, albeit unequivocal consent came before Maddaleni's arrest, and there were only two officers present throughout the encounter. *See United States v. Drayton*, 536 U.S. 194, 197 (2002) (holding encounter with three officers on bus consensual).

Cheun argues that Agent Small's questions to the unknown passengers were "markedly different" in tone from the "barrage of rapid-fire questions" he had been directing towards Maddaleni. Motion to Suppress at 3. For its part, the United States maintains that "[t]he pace and tone of conversation with the couple was the same as with the defendants." Response at 5. The

Court finds that while the pace of Agent Small's voice changed, his tone toward Defendants was the same as his tone of voice in the conversation with the unidentified speakers.

In sum, the number of officers present, their demeanor and their tone of voice indicate a reasonable person would feel free to terminate this encounter.

*Whether and for how long officers retain the defendants' personal effects or identification*. Cheun testified Agent Small did not return his passport to him. Agent Small testified he gave Cheun's passport back after verifying the identifying information within. Agent Small did not note on his belt recording that he returned the passport. Earlier in the recording, Agent Small did make a notation on his belt recording when he had returned Maddaleni's ticket after verifying the information on it. The Court finds Agent Small kept Cheun's passport and did not return it. Under this factor, a reasonable person would not feel free to terminate the encounter with Agent Small.

*Whether the defendant was advised of his right not to cooperate.* Cheun was never advised of his right to refuse to cooperate with Agent Small. Under this factor, a reasonable person would not feel free to terminate the encounter with Agent Small.

In sum, two factors point to the conclusion that a reasonable person would not have felt free to terminate this encounter: Agent Small's retention of Cheun's passport and his failure to advise Cheun of his right not to cooperate. The other five factors point to the conclusion that the encounter was consensual and therefore no seizure took place until Cheun's arrest.

No one factor is dispositive, and this Court will not reach a conclusion about the nature of Cheun's encounter with Agent Small by simply counting factors. *See Thompson*, 546 F.3d at 1226. Nonetheless, the totality of circumstances points to a consensual encounter. Agent Small asked Cheun to consent to a bag search three times during the encounter and received an

affirmative response to each request. The record indicates Agent Small did nothing that would lead a reasonable person to believe he was not free to terminate the encounter.

### b.  Inevitable discovery

Even if a reasonable person would not have felt free to terminate the encounter with Agent Small, this constitutional violation need not require suppression of the methamphetamine in Cheun's suitcase if it "ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). The United States bears the burden of showing by a preponderance of the evidence that the evidence would have been discovered without violating the Fourth Amendment. *United States v. Christy*, 739 F.3d 534, 540 (10th Cir. 2014).

"The ultimate question when applying inevitable discovery…is how likely it is that a warrant would have been issued and the evidence found." *Id.* at 543 (quotation omitted). The Tenth Circuit applies the following factors to determine the likelihood a warrant would have been issued absent the Constitutional violation and the evidence sought to be suppressed would have been discovered:

> (1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; (2) the strength of probable cause at the time the search occurred; (3) whether a warrant ultimately was obtained, albeit after the constitutional violation; and (4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a *fait accompli*.

*United States v. Souza*, 223 F.3d 1197, 1204 (10th Cir. 2000). No one factor is determinative. *Christy*, 739 F.3d at 543.

Here, like *Christy*, the United States had not initiated the process for obtaining the warrant at the time Cheun's Fourth Amendment rights were allegedly violated. But, like *Christy*, the United States already had probable cause to arrest Cheun before the search. Before Agent

Small searched Cheun's bag, Maddaleni said he was traveling with Cheun, and Cheun had confirmed as much. When Agent Small discovered methamphetamine in Maddaleni's bag, he had probable cause to arrest Cheun for conspiracy.

On the third factor, a warrant was ultimately obtained. Agent Small obtained a warrant to search the wrapped package he discovered in Cheun's bag after subjecting it to a dog sniff. On the fourth factor, there is no evidence Agent Small "jumped the gun" in order to force the issue by discovering drugs or other incriminating evidence. Although Agent Small paid particular attention to the discovery of used glass pipes in Defendants berth and some unused glass pipes in Cheun's bag, the simple fact remains that he had already discovered a large quantity of methamphetamine in Maddaleni's bag and had received repeated confirmation from both Defendants that they were traveling together. If anything, Agent Small created the consent issue by continuing to ask Cheun for permission to search his bag when he could have permissibly arrested him after discovering the drugs in Maddaleni's bag.

When Agent Small discovered methamphetamine in Maddaleni's bag, he had probable cause to arrest Cheun and obtain a warrant to search his bag. At the very least, he had reasonable suspicion to detain Cheun and subject his bag to a dog sniff in order to confirm or deny his suspicion that Cheun was trafficking drugs. *United States v. Place*, 462 U.S. 696, 706 (1983). Therefore, even if Cheun had not freely allowed Agent Small to search his bag, the drugs in Cheun's bag would have been inevitably discovered under the search warrant Agent Small ultimately obtained or a brief investigative detention of Cheun's bags based on reasonable suspicion.

### c.   Whether Cheun's *Miranda* rights were violated

Cheun presents an alternative argument for suppression of the methamphetamine found in his bag: Agent Small's failure to advise him of his rights at the onset of his encounter was a violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Under *Miranda*, incriminating statements made during "custodial interrogation" may not be used at a defendant's trial "unless the prosecution demonstrates the use of procedural safeguards effective to secure the Fifth Amendment privilege against self-incrimination." *United States v. Cash*, 733 F.3d 1264, 1276 (10th Cir. 2013) (quotation omitted).

A defendant is subject to custodial interrogation only if the defendant is (1) in custody and (2) is interrogated. Although there is perhaps some case to be made that Agent Small was "interrogating" Cheun when he asked him if he had any drugs or contraband in his bag, Cheun was not in custody prior to his arrest. In order to be in custody, "a person must be under formal arrest or have his freedom of action curtailed to a degree associated with formal arrest." *Cash*, 733 F.3d at 1277 (quotation and alteration omitted). Because this Court has already found a reasonable person in Cheun's position would have felt free to terminate the encounter with Agent Small, it follows Cheun was not "in custody" at any point prior to his arrest. Therefore, Agent Small did not violate Cheun's *Miranda* right.

Even if Cheun was subject to custodial interrogation at the onset of his encounter with Agent Small, *Miranda* does not exclude physical evidence obtained as a result of a procedurally defective interrogation. Instead, a statement leading to the discovery of physical evidence must be involuntarily obtained in order to allow suppression of its physical fruits. *United States v. Patane*, 542 U.S. 630, 644 (2004). In order for a statement to be involuntary, it must be the result

of coercive police activity that undermines the defendant's ability to exercise free will. *United States v. Erving L.*, 147 F.3d 1240, 1249 (10th Cir. 1998).

There is no evidence Agent Small coerced Cheun so as to overwhelm his free will. The only evidence that arguably can be construed as coercive, as noted above, is Agent Small's failure to advise Cheun of his right not to cooperate and his failure to return Cheun's passport. But this at best establishes a violation of *Miranda*, which is concededly insufficient to warrant the suppression of physical evidence. *See Patane*, *supra*. Moreover, this Court is unable to see how any of Cheun's statements prior to his arrest in any way lead to the evidence he now asks this Court to suppress. Cheun maintained his innocence throughout, and the evidence he now seeks to suppress was obtained through a search conducted under authority of a warrant issued after his arrest.

## CONCLUSION

The totality of the circumstances surrounding Cheun's encounter with Agent Small indicate he freely consented to have Agent Small search his bag. Even if he did not, Agent Small would have discovered the drugs in Cheun's bag under the doctrine of inevitable discovery. Finally, Cheun's *Miranda* rights were not violated. But, even if they were, Cheun's statements prior to or after his arrest did not lead to the evidence he seeks to suppress. In addition, even if Cheun's *Miranda* rights were violated and the violation led to the discovery of the methamphetamine he now asks this Court to suppress, Cheun's free will was not undermined to an extent that would allow suppression of physical evidence.

IT IS ORDERED THAT Defendant Anthony Cheun's Motion to Suppress (Doc. No. 37)

is DENIED.


_____

SENIOR UNITED STATES DISTRICT JUDGE