1              UNITED STATES DISTRICT COURT
                 DISTRICT OF NEW MEXICO
2
_____
3  UNITED STATES OF AMERICA,)          Criminal Case No. 14-415
                            )
4       Plaintiff,          )          421 Gold, Sixth Floor
                            )          Albuquerque, New Mexico
5            v.             )          September 23, 2014
                            )
6  ANTHONY CHEUN,           )
                            )
7       Defendant.          )
_____)
8

9            PARTIAL TRANSCRIPT OF MOTIONS
                (TESTIMONY OF KEVIN SMALL)
10                  VOLUME I OF II

11         Before the Honorable James A. Parker
             Senior United States District Judge
12

13  APPEARANCES:

14  For the Plaintiff:        Presiliano Torrez, Esq.
                              P. O. Box 607
15                            Albuquerque, NM  87103

16
    For the Defendant:        Erlinda O. Johnson, Esq.
17                            1110 2nd Street, NW
                              Albuquerque, NM  87102
18

19  Official Court Reporter:  Thomas L. Garrett
                              333 Lomas Blvd., NW, Ste. 270
20                            Albuquerque, NM  87102
                              (505)348-2334
21

22

23

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer-aided transcription.


    14CR415, 9-23-2014

1                            CONTENTS

2

GOVERNMENT'S WITNESS -- KEVIN SMALL
3        Direct by Mr. Torrez                        3
         Cross by Ms. Johnson                       40

4

5   Reporter's Certificate                          70

6

7

8                            EXHIBITS

9

10  Government's:                                   Admitted
    1.    Audio Recording                           11
11  2.    Transcript of Audio Recording
    3-7.  Photographs                               37

12

13  Defendant's:
    A.    Photograph                                56
14  B.    Photograph                                56
    C.    Photograph
15  D.    Photograph                                48
    E.    Photograph
16  F.    Photograph

17

18

19

20

21

22

23

24

25

14CR415, 9-23-2014

KEVIN SMALL

(Being duly sworn, testified as follows:)

DIRECT EXAMINATION

BY MR. TORREZ:

Q.   Okay.  Please state your name, spell your last name.

A.   My name's Kevin Small, S-M-A-L-L.

Q.   And were you formerly employed by the Drug Enforcement Administration?

A.   Yes, sir, I was.

Q.   And you -- did you retire from the drug administration, Drug Enforcement Administration?

A.   Yes.  I retired on March 31st, 2014, after thirty -- 31 years.

Q.   And you served for approximately how many years with the DEA?

A.   Thirty-one.

Q.   And in those 31 years, can you tell us, have you been involved in interdiction cases at the airport, the bus, and the train?

A.   Yes, sir.  In 1987, I started the Albuquerque interdiction unit, which really focused at that time at the Albuquerque International Airport.  In 1988, we moved down to the Amtrak train station.  I worked at the Amtrak train from 1988 to 2005, and from 2005 to 2008 or nine, I worked a truck stop interdiction unit out on Interstate 40.  And in 2005 -- or nine

14CR415, 9-23-2014

1    until the day I retired, I was back again at the train and bus

2    station here in Albuquerque, New Mexico, working drug

3    interdiction.

4    Q.    And if you were to venture your best estimate,

5    approximately how many interdiction cases have you been

6    involved in either as primary or as a secondary agent?

7    A.    Primary or secondary, I had somewhere between three to

8    4,000, and that's just a rough guess.

9    Q.    And can you -- can you tell the -- the Court, because of

10   your extensive work in the area of interdiction, were you

11   called upon by your agency to develop some training materials,

12   and have you actually taught in the area of interdiction?

13   A.    Yes, I have.

14   Q.    And explain that to the Court, if you would.

15   A.    There is presently a class being taught at the DEA academy

16   at Quantico, Virginia, and that class I wrote in 2001/2002.  I

17   got it approved through a Department of Justice chief counsel,

18   through DEA chief counsel, and I also am the instructor for

19   what they call Operation Jetway, which is a DEA-funded program

20   where we go around the country teaching drug interdiction to

21   federal, state, local officers, and in my gamut, I teach a

22   consensual encounter class and I teach an Amtrak interdiction

23   class and a Greyhound bus interdiction class.  I wrote all

24   three of those classes, and they have all been approved through

25   the Department of Justice.

1   Q.   Okay.  And since your retirement, have you been called

2   upon or will you still be involved in this teaching?

3   A.   Yes.  I -- the Drug Enforcement Administration still

4   uses -- utilizes me as an instructor.  I was just out last

5   week, instructing the week before that.

6   Q.   Now, calling your attention to January 29th of this year,

7   can you describe to the Court what you were doing on that day

8   just prior to having an encounter with Mr. Anthony Cheun, the

9   defendant in this case?

10  A.   Myself, Special Agent Jay Perry, and Task Force Officer

11  John Walsh were at the Greyhound bus station here in

12  Albuquerque, New Mexico, at 320 First Street when the Greyhound

13  bus arrived.  The Greyhound buses and the Amtrak train, the

14  morning bus and train arrive roughly the same time.  We were at

15  the bus when, actually, the train pulled into the station.  So

16  Agent Perry and Task Force Officer Walsh were at the bus, so

17  usually, just two of us work the bus.  So I went over to the

18  Amtrak train to check out some possible leads we may have had.

19  Q.   Okay.  And just so that the record is clear and perhaps

20  people in this courtroom will understand it, but describe the

21  locations of the two places that you were describing, the bus

22  station and the Amtrak train station, in relation to one

23  another.

24  A.   They're actually located in the same building.  They're

25  down at 320 First Street.  One half of the building is Amtrak,

14CR415, 9-23-2014

 1  the other half is Greyhound.  So if you buy a ticket, you must

 2  walk into this building, go to which whatever way you're going

 3  to go on, but the buses sit 30 to 50 yards from the train

 4  tracks, and the -- if you're at the train and you look out a

 5  window, you're going to see the bus and vice versa.  They're --

 6  you can hear -- take a ball and hit each one.

 7  Q.   Okay.  And describe what you did after you separated from

 8  Special Agent Perry and the Task Force Officer Walsh.

 9  A.   I went to the sleeper car and I talked to one of the car

10  attendants there.  I had reviewed a reservation for a couple

11  passengers earlier in the day that were traveling from

12  Flagstaff, Arizona, to Chicago, Illinois.  It was bought four

13  days prior, which is a little out of our window of

14  characteristics we look for, but I thought I'd check just to

15  see what the status of the passengers were.  The car attendant

16  told me that she hadn't seen the passengers.  They'd been in

17  their room the entire time.

18  Q.   Okay.  And so did you actually go inside the train?

19  A.   Yes, I did.  At that time, I boarded the train and went to

20  the room.

21  Q.   Okay.  And describe the room and the surrounding area.

22  A.   It's a deluxe sleeper, and a deluxe sleeper can sleep four

23  people.  That's -- that's pushing it.  It has a toilet and a

24  shower inside the room.  It's the most -- the second most

25  expensive room on the train, and there is five of those on one

1    car.  So on the entire train, there's ten of those rooms.  In

2    January, not all the rooms were occupied.  A couple rooms were

3    actually empty because of that time of the year.  It's not a

4    very busy time to travel on the Amtrak.

5    Q.   And based on your past experience and your having been on

6    the train before, can you describe the size of the room?

7    A.   The room is roughly 10 to 12 feet deep by eight to 10 feet

8    wide.

9    Q.   Okay.  And what about the -- is there a -- a hallway or a

10   corridor right outside it?

11   A.   There is.  There's a hallway that runs from north to south

12   on the train.  On that day, the rooms were on the west side of

13   the train.  The hallway was on the east side of the train.  The

14   rooms, the deluxe sleepers, Rooms A through E, are on the upper

15   level of the train.  The train's a double-decker train, so on

16   the upper level are the -- the more expensive rooms.

17   Q.   Now, did there come a time when you encountered either

18   Mr. Cheun or his traveling companion?

19   A.   Yes.

20   Q.   And describe that to the Court.

21   A.   I walked by all the rooms.  I had observed a couple of

22   them were empty, and I went back to the room that I knew they

23   were in and I -- the curtain was closed.  I could not see in

24   it, so I knocked on the door.

25   Q.   All right.  And who answered?

14CR415, 9-23-2014

1   A.   A man I did not know at that time.  I saw a man.  He

2   opened the drape, and I know that man now to be Mr. Maddaleni.

3   Q.   Okay.  And did you introduce yourself to him?  What --

4   what transpired between you and Mr. Maddaleni?

5   A.   I had a DEA badge I wear around my neck on a chain, and

6   that day, I, before I knocked on the door, I pulled it out of

7   my shirt, and it hung out around my neck, and it's hung on my

8   chest.  And I actually grabbed the chain, my badge, and I show

9   it to him.  I said, "Hello, sir.  How are you doing?"  And I

10  just show him the badge.  He was still in the room.  At that

11  time, he took a second and came out of the room, and I

12  identified myself as a police officer and asked if I could

13  speak to him.

14  Q.   Okay.

15            THE COURT:  Now, when he came out of the room, where

16  was he standing and where were you standing?

17            THE WITNESS:  I was standing to the south, and he was

18  standing literally a foot from me, facing me in the hallway,

19  and he was standing right in front of his door.

20            THE COURT:  Was he entirely in the hallway?

21            THE WITNESS:  Yes, sir, because when he came out of

22  the room, he actually shut the door behind him, and he was

23  entirely in the hallway with me.

24            THE COURT:  Okay.  Okay.  Go ahead, Mr. Torrez, and

25  as I indicated earlier, I would like to know the precise

1   location of each participant in the conversation as the

2   conversations took place.

3   BY MR. TORREZ:

4   Q.   Okay.  Were there -- was there anyone else in the vicinity

5   or the close proximity of the room?

6   A.   In the hallway, no.  It's just him and I.  I was by

7   myself.  There were two passengers sitting in a room next to

8   us.  They had just got on the train, and they were just sitting

9   in the room, waiting for the conductor to come grab their

10  ticket.

11  Q.   And tell us, how did your conversation go?  Well, before I

12  ask that, you han -- you showed them your badge.  How were you

13  dressed?

14  A.   In January, blue jeans, long sleeve shirt.  I may have had

15  a jacket on if it was chilly.  It probably was in January.  I

16  had a gun, my badge and my handcuffs, and I had a recording

17  device.

18  Q.   And where did -- where would your weapon -- was your

19  weapon displayed, or tell us, describe that for the Court.

20  A.   I wear my shirt out.  I never tuck my shirt in to cover my

21  weapon.  My -- I am right-handed.  My gun is on my right-hand

22  side on a holster.  My shirt is covering it.  My -- if I had

23  had a jacket, my jacket would also have been covering it.  My

24  badge, like I said, was visible around my neck.  My handcuffs

25  are on my left-hand side in my front, covered by my shirt and

1   my jacket, and my recording device is on my left front also in

2   a pouch, and the microphone runs up underneath my shirt out of

3   sight of individuals, and it's clipped to the inside of my

4   shirt.

5   Q.   Okay.  Now, at the time you're engaged in conversation

6   with Mr. Maddaleni, do you have a recording device or are you

7   recording the conversation?

8   A.   Yes, I am.  Before I knock on the door, I activate the

9   recording device.

10  Q.   All right.  And have you had an opportunity to listen to

11  that tape prior to this hearing?

12  A.   Yes, I have.

13  Q.   More than one -- on more than one occasion?

14  A.   Yes.

15  Q.   Okay.  And in fact, did you listen to it yesterday and

16  then again this morning?

17  A.   Yes.

18  Q.   Okay.  So you can identify the speakers on the tape?

19  A.   Yes, I can.

20  Q.   Yourself and those other speakers that -- that appear or

21  voices appear on the tape?

22  A.   Yes, I can.

23           MR. TORREZ:  Your Honor, we would move to introduce

24  Government's Exhibit 1.  That is the tape recording itself.  It

25  is short, and I'd ask permission to play the tape, and then

14CR415, 9-23-2014

1    we'll come back and I'll clarify where the agent is standing

2    and the various parties are standing during the course of the

3    conversation.

4              THE COURT:  That's fine.  I assume there's no

5    objection.  I've already listened to the tape.

6              MS. JOHNSON:  I don't believe so, Your Honor.  I'm

7    sure it's the same one that has been provided to the defense.

8              THE COURT:  Okay.  Well, it's admitted into evidence.

9    Go ahead.

10        (Government's Exhibit 1 admitted into evidence.)

11             MR. TORREZ:  Let's move it into evidence as

12   Government's 1 and request permission to play it.

13             THE COURT:  It's in evidence.  You may play it.

14             MR. TORREZ:  It's already introduced as part of our

15   evidence, so we'd request permission to play it.

16             THE COURT:  You may play it.

17        (Recording played.  See transcript, Government's

18        Exhibit 2, Page 3, Lines 1 through 10.)

19             THE COURT:  All right.  Stop it right there for a

20   moment.  Stop it right there for a moment, please.

21             Okay.  Who's standing where?

22             THE WITNESS:  I am at the door.  To knock on the

23   door, I have to be right in front of the door to knock on it,

24   but when he opened --

25             THE COURT:  Now, are you standing in the hallway or

1   on the threshold, or where are you?

2              THE WITNESS:  Well, I can't be on the threshold,

3   because the door is shut.  I'm standing back in the hallway to

4   the south of the door.

5              THE COURT:  Okay.

6              THE WITNESS:  If it would help, I could draw it on a

7   map, the easel here.

8              THE COURT:  No, just show me how -- tell me how far

9   south of the door you are.

10             THE WITNESS:  Not very far at all.  Let's see, extend

11  my arm out and knock is, what, three feet, so --

12             THE COURT:  Okay.  And then there's another voice

13  responding, and where is that voice coming from?

14             THE WITNESS:  Inside the room.

15             THE COURT:  All right.  Can you see the person?

16             THE WITNESS:  No.  It's dark.  I cannot see him.

17             THE COURT:  All right.  Go ahead, Mr. Torrez.

18        (Recording played.  See transcript, Government's

19        Exhibit 2, Page 3, Line 11, through Page 7, Line 24.)

20             THE COURT:  Stop.  Stop it just a minute again.

21             Throughout this conversation, is Mr. Maddaleni still

22  in the room?

23             THE WITNESS:  No, sir.  Each time he comes out, he

24  shuts the room, the door behind him.

25             THE COURT:  Back it up and tell me where he came out.

1   BY MR. TORREZ:

2   Q.   Describe -- describe where the people are.

3   A.   He wants to play the tape and tell him.

4   Q.   Back it up?

5   A.   Yeah.  He's hard of hearing.

6           THE COURT:  You need to do this each time there's a

7   change of position.  Now, you need to know where the

8   conversa -- people are when the conversations are taking place.

9           THE WITNESS:  I never leave my position.  I'm always

10  in the same place.

11          THE COURT:  Okay.

12          THE WITNESS:  I'm waiting for them to come out of the

13  room.

14          THE COURT:  All right.  You need to tell me when he

15  steps out, then.

16          THE WITNESS:  Okay.

17          THE COURT:  And can you just tell us?

18          THE WITNESS:  I can do it without the tape.

19          THE COURT:  Yeah, why don't you do it, just tell us

20  where in the conversation he steps out.

21          THE WITNESS:  Every time I ask him for something, he

22  had to go back into the room, and when he went back into the

23  room, he shut the door, and I waited for him, and he came back

24  in, and I stayed where I was originally, a little south of the

25  room in the hallway.

1            THE COURT:  Okay.  Well, let's try to find it on the

2    transcript.

3            THE WITNESS:  Okay.

4            THE COURT:  Do you have a copy of the transcript?

5            THE WITNESS:  Yes, I do.

6            MR. TORREZ:  Just for the purpose of the record, the

7    transcript is marked as Government's Exhibit 2.

8            THE COURT:  Right.

9            THE WITNESS:  On Page 3.

10            THE COURT:  All right.

11            THE WITNESS:  He comes out at Line 15.

12            THE COURT:  Where he says to you, "How are you doing

13    today?"

14            THE WITNESS:  Yes.  The door's open, and he's coming

15    out of the room.

16            THE COURT:  Okay.  Now, where did he stand during

17    this?

18            THE WITNESS:  He stood directly in front of the door.

19    He shut the door behind him and he stood directly in front of

20    it, and he's facing me --

21            THE COURT:  Okay.

22            THE WITNESS:  -- and I'm facing him.

23            THE COURT:  Tell me the line where he shut the door

24    behind him.

25            THE WITNESS:  Right about between 16 and 17, after he

 1   says, "How are you doing today?"  Wait a minute.  No, I stand

 2   corrected, Your Honor.  It's Line 21, because when he steps out

 3   of the room, he has a laptop computer cord wrapped around his

 4   leg.

 5             THE COURT:  Uh-huh.

 6             THE WITNESS:  And I said, "Watch out, your leg's

 7   caught up in that cord."  So he takes the cord off his leg and

 8   puts it in the room, and he shuts the door at that time.

 9             THE COURT:  Okay.

10             THE WITNESS:  So Line 22, 23.

11             THE COURT:  Okay.

12             THE WITNESS:  And now, he's in the hallway with me.

13   We talked.  I asked him for his ticket, and at Lines 17 and 18,

14   Mr. Maddaleni says he -- he's got to grab his ticket.

15             THE COURT:  Okay.  This is on Page 4.

16             THE WITNESS:  Page 4.  I'm sorry, Your Honor.  And he

17   goes into the room, and I tell him at Line 22, "Go ahead and

18   take your time."  And he goes inside after he says, "Okay," to

19   me on Line 24.

20             THE COURT:  Okay.  That's where he returns to his

21   room.

22             THE WITNESS:  And he shuts the door behind him.  And

23   I'm still in the hallway, and I wait for him.

24             Then he comes right back out at Lines -- Page 5,

25   Line 2, he comes back out and he tells me the rooms, "They're

 1  not very big, are they?"  That's when he comes back into the

 2  hallway.

 3          THE COURT:  Did he shut the door behind him?

 4          THE WITNESS:  Yes, sir, he did.

 5          THE COURT:  All right.  Go ahead.

 6          THE WITNESS:  I ask him at -- on Page 5, Line 11, "Do

 7  you have your ID with you, Phil?"  And he says yes, and I say

 8  to him, here, take this back with you.  I hand him back his

 9  ticket, and he goes back into the room to get his ID.

10          THE COURT:  Okay.  Just a moment.

11          THE WITNESS:  Wait a minute.  No, he did not have to

12  go back.  He had his ID with him.  I take that back, Judge.  I

13  was wrong.  He had his ID with him.

14          THE COURT:  But is that where you handed his ticket

15  back to him?

16          THE WITNESS:  Yes, and he hands me his ID.

17          THE COURT:  All right.

18          THE WITNESS:  And we're in the hallway talking for a

19  while there until Line -- Page 7.  He -- we talk about

20  searching the bag, and I've asked him for consent, and he says,

21  "Sure," Line 18, "Can I pee real quick?"

22          I said go ahead and do it:  "Go right ahead."

23          So at Line 23, he says, "All right," to me.  He goes

24  back into the room after Line 23 and shuts the door behind him.

25          THE COURT:  All right.

1              THE WITNESS:  And that's all the farther I think the

2    tape has played.

3              THE COURT:  All right.  Let's resume the tape, then,

4    and when we get to another point where he comes back out or

5    Mr. Cheun comes back out, let us know.

6              THE WITNESS:  All right.  I will.

7              MS. JOHNSON:  Your Honor, this is Mr. Maddaleni just

8    for the record.  Your Honor just said Mr. Cheun.

9              THE COURT:  I said let us know when Mr. Maddaleni --

10             MS. JOHNSON:  Oh.

11             THE COURT:  -- comes back out or if Mr. Cheun comes

12   out.

13             MS. JOHNSON:  Okay.  Thank you, Your Honor.  I

14   apologize.

15             THE COURT:  All right.  Go ahead.

16        (Recording played.  See transcript, Government's

17        Exhibit 2, Page 8, Line 4, through Page 13, Line 21.)

18             THE WITNESS:  Pres?  Pres?  Great.

19             At this time, right there at Line 22, Page 13,

20   Mr. Cheun walks out of the room.

21             THE COURT:  Okay.  He actually came into the hallway?

22             THE WITNESS:  Yes, and he -- he shut the door behind

23   him.

24             THE COURT:  Okay.  Excuse me just a moment.

25             Go ahead.

14CR415, 9-23-2014

1          THE WITNESS:  And I'm still in my same position

2    because you want to know where I was.  I'm still there, and

3    Mr. Cheun is now where Mr. Maddaleni was standing earlier, to

4    the north of me, facing the south, looking me in my face.

5          THE COURT:  Okay.  And you're both in the hallway?

6          THE WITNESS:  Yes, sir.

7          THE COURT:  All right.  Go ahead.

8       (Recording played.  See transcript, Government's

9        Exhibit 2, Page 13, Line 23, through Page 15, Line 16.)

10          THE WITNESS:  All right.  Right there, Mr. Cheun goes

11   back into the room, I'm assuming to get his passport, and he

12   shuts the door behind him.  Excuse me.  And I'm still in the

13   hallway where I originally was.

14          THE COURT:  Okay.  Go ahead.

15       (Recording played.  See transcript, Government's

16        Exhibit 2, Page 15, Lines 17 through 23.)

17          THE COURT:  All right.  Stop it right there if you

18   would, please.

19          The conversations you're having with the unidentified

20   female and the unidentified male, was that -- was that taking

21   place in the hallway?

22          THE WITNESS:  No, sir.  They're actually sitting on

23   their bed.  They just boarded the train in Albuquerque, and

24   they were sitting on their beds, and when you get on the train,

25   they tell you, stay in your room until the conductor comes by

14CR415, 9-23-2014

1   to get your ticket.  So they were doing as instructed, and they

2   were –– if I may, they were sitting on their beds like this.

3   The woman was near the window.  The man was near the aisle, and

4   from where I'm positioned, I can see them sitting there.  So I

5   just struck up conversation with them.

6            THE COURT:  Was their room adjacent to the room of

7   Mr. Maddaleni and Mr. Cheun?

8            THE WITNESS:  Yes.  Mr. Maddaleni and Mr. Cheun were

9   in Room D, as in "David," and they are Room E, as "Echo," right

10  next door, and if the door is open, they can see me, and their

11  door was open, and the curtain was pulled back, and they could

12  easily see me standing there.

13           THE COURT:  Okay.  And could they –– were they in a

14  position where they could hear the conversation between you and

15  Mr. Cheun and Mr. Maddaleni?

16           THE WITNESS:  Yes, they could.

17           THE COURT:  And would Mr. Cheun or Mr. Maddaleni be

18  able to hear your conversation with them if they, Mr. Cheun or

19  Mr. Maddaleni, were standing in the hallway?

20           THE WITNESS:  Yes, they could.

21           THE COURT:  Okay.  Go ahead.

22         (Recording played.  See transcript, Government's

23          Exhibit 2, Page 16, Lines 1 through 23.)

24           THE WITNESS:  All right.  At Line 23, Page 16,

25  Mr. Cheun opens the door, comes back out, and shuts the door

1  behind him, and at this time, he has his passport, and I'm

2  still standing where I was, and he is standing to the north of

3  me, facing the south, looking at me.

4           THE COURT:  Okay.  Go ahead.

5       (Recording played.  See transcript, Government's

6       Exhibit 2, Page 16, Line 24, through Page 20, Line 3.)

7           THE WITNESS:  Stop.

8           At Page 20, Line 2, Task Force Officer John Walsh

9  appears in the hallway, and he's standing behind me to my

10 south.

11          THE COURT:  How far back?

12          THE WITNESS:  Um, I could touch him, so within three

13 feet, and I introduced him to Mr. Cheun at that time.  Jay

14 Perry has arrived, but Jay Perry can't be seen.  He's -- I saw

15 his head, but he stood behind there's a -- that couple I was

16 talking to in that room, --

17          THE COURT:  Uh-huh.

18          THE WITNESS:  -- they're in the last room in the

19 hallway.  On the other side of them is the stairs leading

20 downstairs, so there's actually wall, and he was standing

21 against that wall.  But in the hallway with me was just Task

22 Force Officer Jonathan Walsh.

23          THE COURT:  Could Perry be seen from the doorway to

24 Mr. Maddaleni and Mr. Cheun's room?

25          THE WITNESS:  He -- when he first got there, he poked

14CR415, 9-23-2014

1    his head around.  I saw his head.  After that, I didn't see him

2    again until I called for him.

3              THE COURT:  Okay.  All right.  Go ahead.

4         (Recording played.  See transcript, Government's

5         Exhibit 2, Page 20, Lines 4 through 9.)

6              THE WITNESS:  All right.  Stop it.

7              At this time, the door opens.  Mr. Cheun is still in

8    the hallway.

9              THE COURT:  What line are you talking --

10              THE WITNESS:  Oh, I'm sorry, Your Honor, Page 20,

11   Line 6.

12              THE COURT:  And Mr. Maddaleni opens the door at that

13   point?

14              THE WITNESS:  Yes.  And he is standing in the room.

15   He doesn't come out in the hallway.  Now, the room is shut with

16   curtains and it's really dark.  It's hard to see into the room

17   even though it's noon.  Those curtains are, like, blacked out

18   so you can sleep in the daytime, and I can't see very good into

19   the room, but he is standing a foot, foot and a half into the

20   room.

21              THE COURT:  Okay.  Go ahead.

22         (Recording played.  See transcript, Government's

23         Exhibit 2, Page 20, Lines 9 through 18.)

24              THE WITNESS:  All right.  Stop.

25              I'm talking to Mr. Maddaleni, and I ask him if it's

 1  all right if I come into his room.  And at Lines 15, I asked

 2  that question on Page 20, and he answers me, Line 17, "Sure."

 3  So at that time, I step into the room on -- at Line 18 because

 4  I say I'll step into the room.

 5          THE COURT:  Okay.  And Mr. Maddaleni is still in the

 6  room with you?

 7          THE WITNESS:  He is in the room with me, and at this

 8  time, Mr. Cheun is in the doorway watching us.  He's standing

 9  in the doorway, looking into the room.

10          THE COURT:  Okay.  Go ahead.

11      (Recording played.  See transcript, Government's

12      Exhibit 2, Page 20, Line 19, through Page 21, Line 6.)

13          THE WITNESS:  Can you stop it there?

14          At that moment, I found the drugs.  Mr. Maddaleni is

15  still in the room with me, and I'm about to ask him to step

16  outside into the hallway because I'm going to put him under

17  arrest.

18          THE COURT:  Okay.  You found -- the drugs you found

19  at this point were in Mr. Maddaleni's suitcase; is that right?

20          THE WITNESS:  That's correct.  There -- there were

21  two Tupperware containers shoved in the pant leg of his pants,

22  and I even asked him, is that yours?  And he said, "Yeah."

23          So I know Jonathan Walsh was also out in the hallway

24  with Mr. Cheun, so I, in an arrest situation, I have him

25  getting out in the hallway where it's a little more safer to

 1  make the arrest, and I ask him to step out into the hallway.  I
 2  don't ask him; I pretty much order him at that time to step out
 3  into the hallway.
 4          THE COURT:  All right.  Go ahead.
 5       (Recording played.  See transcript, Government's
 6          Exhibit 2, Page 21, Lines 9 through 13.)
 7          THE WITNESS:  Could you stop it right there?
 8          My part -- Jonathan Walsh doesn't know what's
 9  occurred.  He doesn't know I found drugs, so when I walk out in
10  the hallway, I have Mr. Maddaleni.  Jonathan, in a defensive
11  mode, backs away.  He's -- he's taken -- steps backwards
12  because he doesn't know what's going on.  He's just trying to
13  be safe, goes, why is everybody coming out of the room?  He
14  doesn't --
15          THE COURT:  You say Jonathan.  This is?
16          THE WITNESS:  Jonathan Walsh, the Task Force Officer
17  Jonathan Walsh.
18          THE COURT:  All right.  And he's backing down the
19  hallway?
20          THE WITNESS:  Because he doesn't know what's going
21  on.  All he sees me is (sic) come out of the room with him, and
22  I haven't said that I found drugs.
23          THE COURT:  Okay.  Now, where is Mr. Cheun at this
24  time?
25          THE WITNESS:  Still right at the door.  He is

1    actually, when I step out of the room, Mr. Cheun is now behind

2    me to the north, and I'm headed to the south, and I --

3              THE COURT:  Is Mr. Cheun in the hallway?

4              THE WITNESS:  Yes, sir, he is.

5              THE COURT:  North of the door?

6              THE WITNESS:  Yeah, north of the door.

7              THE COURT:  All right.

8              THE WITNESS:  And I -- Jonathan Walsh can hear the

9    conversation.  I said, walk down there, put your hands behind

10   your back, and at that time, Jonathan Walsh handcuffed

11   Mr. Maddaleni in the hallway.

12             THE COURT:  All right.  Go ahead.

13             THE WITNESS:  At the time of the handcuff,

14   Mr. Maddaleni is now facing me, so he's facing north and he's

15   also facing Mr. Cheun, which who's behind me, and Jonathan

16   Walsh handcuffs him behind his back, and at that time, Jonathan

17   Walsh walks him away from the room out of sight of where I am.

18   I don't know where he takes him, but he's no longer -- Jonathan

19   Walsh is no longer with me, and Jay Perry then walks up to be

20   with me because we still have another individual.

21             THE COURT:  Was Mr. Cheun in a position to observe

22   Mr. Maddaleni being handcuffed?

23             THE WITNESS:  He probably couldn't see the actual

24   because I was in between.  He could -- I can't say what he saw,

25   but he probably figured out what was happening.

14CR415, 9-23-2014

1          THE COURT:  Was he close enough to hear the

2    conversation about your -- your telling Mr. Maddaleni to step

3    out for a moment and walk down to your partner?

4          THE WITNESS:  Yes, he could hear that.

5          THE COURT:  All right.  Go ahead.

6       (Recording played.  See transcript, Government's

7       Exhibit 2, Page 21, Lines 13 through 18.)

8          THE WITNESS:  Mr. Maddaleni is now gone.  Mist --

9    ju -- ta -- Task Force Officer Jonathan Walsh has walked him

10   away from the room, and I can't tell you where they went.

11         THE COURT:  All right.

12         THE WITNESS:  I don't see them anymore.  I now turn

13   to Mr. Cheun, who is still standing a little bit to the north

14   of the room, and him and I have a conversation.  At this time,

15   Jay Perry or Special Agent Jay Perry has come up behind me

16   because he knows we have one person in custody, and he's just

17   standing there for my safety and everybody's safety and he's

18   just he -- Mr. Cheun can see Mr. Per -- Agent Perry.  Agent

19   Perry can see Mr. Cheun, and they can see me.  We're all

20   standing in the hallway together, but Mr. Cheun is farthest to

21   the north.  I'm in the middle, and Jay Perry is behind me.

22         THE COURT:  All right.

23      (Recording played.  See transcript, Government's

24      Exhibit 2, Page 21, Line 19, through Page 22, Line 10.)

25         THE WITNESS:  He moved to the north.  I got

1    permission to search his bag and I asked him to stay out of the

2    room, and he stands at the door.  I go into the room, and he is

3    standing at the door, watching me in the room.

4                THE COURT:  Where?  What line is that?  On Page 22, I

5    guess.

6                THE WITNESS:  Page 22.

7                THE COURT:  Where do you enter the room?

8                THE WITNESS:  Line 9:  "Okay.  Why don't you stay out

9    here.  All right?"  Line 9, I go into the room.  Jay Perry is

10   also there.  He is to the south of Mr. Cheun.  I can't see

11   Special Agent Perry, but I know he's there.  Mr. Cheun is

12   blocking the door.  I can't see anything.

13               THE COURT:  He's in the hallway right in front of the

14   door?

15               THE WITNESS:  Mr. Cheun is, yes, sir, he is.

16               THE COURT:  Okay.  Just a moment.  And Perry is just

17   to the south?

18               THE WITNESS:  Yes, sir.

19               THE COURT:  All right.  Go ahead.

20          (Recording played.  See transcript, Government's

21            Exhibit 2, Page 22, Line 11, through Page 24, Line 2.)

22               THE WITNESS:  At that time, right on the bottom of

23   Page 24, Line 24, 25, Mr. Cheun is more leaning into the room

24   now.  He's pointing things out to me.

25               THE COURT:  At the bottom of Page 24?

1              THE WITNESS:  Yes.  And he's trying to point things

2    out to me in the room, and it's still very dark.  I somewhat

3    made a mistake.  I should have opened the curtains so I could

4    see.  It was really dark in that room, and he was trying to

5    point things out, and I was having a hard time seeing where he

6    was pointing.  And at that time, I still don't see Agent Perry.

7    I know he's there, but he's -- I can't see him from inside the

8    room.

9              THE COURT:  All right.  Go ahead.

10         (Recording played.  See transcript, Government's

11         Exhibit 2, Page 24, Line 3, through Page 25, Line 1.)

12             THE WITNESS:  Actually, at that Page 24 at Line 24,

13   when Mr. Cheun looks into the room, Jay Perry actually gets

14   behind me to make sure everything's okay, and Jay has actually

15   now moved to the north of Mr. Cheun.  Mr. Cheun is right in the

16   doorway, but Jay has now moved around his back and he's to the

17   north of him.  Jay's trying to look into the room to see if

18   everything's okay.  And so I then point to him:  That's my

19   partner right behind you.  So he's technically to his north but

20   behind him.  That's Special Agent Jay Perry.

21             THE COURT:  Okay.  When you say, "I'm going to pass

22   it out to him," what are you talking about?

23             THE WITNESS:  There is a large white sack like you

24   get at a store, a gift bag sack, and it's all taped up, and

25   I've asked him if he'd give me permission to open it.  He's

14CR415, 9-23-2014

1  told me he didn't want to rip it, and I -- he told me there

2  were geodes inside, geodes, and I did not know what a geode

3  was, and I thought maybe Jay Perry knew what a geode was, so I

4  asked him:  Hand the sack out to Jay, and they could talk about

5  the geodes to see if the conversation made any sense.

6          THE COURT:  So when you say, "I'm going to pass it

7  out to him," you're talking about this big bag that's --

8          THE WITNESS:  Right.  It's the bag's maybe a foot

9  long by six inches wide.  It's something you get at a store,

10  like for wedding gifts, and they -- they put stuff in it and

11  put stuffing paper in it to make it look nice.

12          THE COURT:  All right.

13          Go ahead.

14      (Recording played and stopped.)

15          THE WITNESS:  Do you want to stop it for a second?

16          While I'm doing this right now, I'm going through

17  things in his suitcase, and there are -- I learn at this time

18  what a geode is going to be because there is these items

19  wrapped up in paper.  And I unwrap them and I find out what a

20  geode is, but while I'm doing that, Jay Perry, Special Agent

21  Perry, and Mr. Cheun are in the hallway talking, and they're

22  actually facing each other.  Mr. Cheun is to the south of Mr.

23  Perry, and Agent Perry is to the north, and they're talking

24  about the sack.  That's why I'm -- I'm in the room.  I'm on my

25  hands and knees in the room in the dark trying to locate

1   things.

2          THE COURT:  Well, why on Line 2 on Page 25 did you

3   comment, "Well, right now your partner's under arrest"?

4          THE WITNESS:  Because he -- I must have been asked a

5   question.  His partner, Mr. Maddaleni, was under arrest because

6   he was, and I'd have to look back on the other one.

7          I'd have to listen to the tape to find out why I said

8   that.  Looking at the transcript, I couldn't tell you right

9   now, Your Honor.

10          THE COURT:  Well, let's listen to it and see if that

11   helps you.

12       (Recording played.  See transcript, Government's

13        Exhibit 2, Page 25, Lines 2 and 3.)

14          THE WITNESS:  Stop it.

15          I'd have to get right next to it, but Mr. Cheun must

16   have said something and it's not on the transcript.  It's --

17          MS. JOHNSON:  Objection, Your Honor; speculation.

18          THE COURT:  All right.  Play it back again.  Let's

19   see if we can hear anything.

20       (Recording played.  See transcript, Government's

21        Exhibit 2, Page 24, Line 24, through Page 25, Line 3.)

22          THE COURT:  Okay.

23          THE WITNESS:  One thing with these microphones, Your

24   Honor, they pick up the sound closest to me.  I could hear the

25   conversation in the hallway, and I answered the question I

 1   heard.  You cannot hear it because I am unwrapling (sic) paper,

 2   and that paper is right up on the microphone, and all you can

 3   hear is paper doing what it's doing, but I could hear the

 4   conversation.  I answered the question that Mr. Cheun asked,

 5   and I, unfortunately, I can't hear the question, but he was --

 6   he said something, and I could hear it that day because I was

 7   listening.  But unfortunately with the paper, you cannot hear

 8   it.  That's just one of the problems with the microphone.

 9           THE COURT:  So it's your testimony you were

10   responding to a question by Mr. Cheun when you said, "Well,

11   right now your partner is under arrest"?

12           THE WITNESS:  That's correct.

13           THE COURT:  All right.  Go ahead.

14       (Recording played.  See transcript, Government's

15         Exhibit 2, Page 25, Line 4, through Page 27, Line 7.)

16           THE COURT:  Stop.  Stop it right there if you will.

17           Throughout this part of the conversation, where is

18   Mr. Cheun standing?

19           THE WITNESS:  Right in the doorway, and he's

20   facing -- watching me, and sometimes he will face to talk to

21   Special Agent Perry.  Special Agent Perry is still north of the

22   room, and Mr. Cheun is still in the doorway, and I'm in the

23   room.

24           THE COURT:  When you say he's in the doorway, where

25   is he standing exactly?

1              THE WITNESS:  He's -- he's not in the doorframe

2  itself.  He's out in the hallway more but right in front of the

3  door.

4              THE COURT:  Okay.

5              THE WITNESS:  I never lost sight of Mr. Cheun.

6              THE COURT:  Okay.  But he's standing in the hallway,

7  not in the -- the doors?

8              THE WITNESS:  Not in the actual doorframe, no, sir,

9  he isn't.

10             THE COURT:  All right.  Okay.

11        (Recording played.  See transcript, Government's

12        Exhibit 2, Page 27, Lines 7 through 22.)

13             THE WITNESS:  Right there on Page 27, Line 20,

14  Special Agent Perry is holding the sack the entire time, and he

15  tells me, I'm going to sit it right here.  So Jay, Special

16  Agent Perry, leans into the room and lays that white sack on

17  the bed.  And he goes back out into the hallway where he was

18  standing originally to the north of the room, and Mr. Cheun is

19  still in the hallway to the south of Agent Perry.

20             THE COURT:  That's where you say, "Okay, Jay"?

21             THE WITNESS:  Yes.

22             THE COURT:  All right.  Go ahead.

23        (Recording played.  See transcript, Government's

24        Exhibit 2, Page 27, Line 23, through Page 29, Line 18.)

25             THE COURT:  Okay.  Let's stop it there for a moment.

14CR415, 9-23-2014

1          What led Agent Perry to tell Mr. Cheun to turn around

2     and say, "I'm going to place you in handcuffs"?

3          THE WITNESS:  I didn't hear that in the conversation

4     then.  I don't remember him saying that.  I was, on Line 17, I

5     was telling Jay Perry to do that at that time:  "Jay, at this

6     time, I think --"

7          THE COURT:  What were you telling Agent Perry to do?

8          THE WITNESS:  I thought I had -- I had enough to

9     arrest him at that time, and that's what I was telling him to

10    do, and he cut me off and told the guy to turn around and put

11    his hands behind his back.

12         THE COURT:  Why were you telling him to arrest

13    Mr. Cheun at that point?

14         THE WITNESS:  During the search of the room, I had

15    found one or two butane torches that are used to heat up

16    paraphernalia pipes, and you smoke either bath salts or crack

17    or methamphetamine through these pipes.  On the floor in the

18    room was one, if not -- I know for sure one pipe that had

19    residue in it.  In 31 years, I knew they were smoking dope in

20    the room, and that was drug paraphernalia, and along with the,

21    then, the lies, the inconsistencies or the lies I was told

22    talking to them.  I was arresting them for the paraphernalia

23    and also the conspiracy to con -- to distribute the drugs I'd

24    already found.

25         THE COURT:  Okay.  What lies are you referring to?

1                THE WITNESS:  Um, the first lie was how they got out

2      there.  One of them said they flew, and the other one said they

3      drove a car.

4                THE COURT:  All right.

5                THE WITNESS:  And the second was the way they bought

6      their ticket.  It is not consistent with the travel they took.

7      They were going to Arizona to buy a car.  The ticket was bought

8      at one o'clock in the morning on January 25th, four days prior

9      to this day.  If they were going out to Arizona to buy a car,

10     you would not be coming back on an Amtrak train.  You would be

11     bringing the car back.  They knew before they left they weren't

12     buying a car.

13               MS. JOHNSON:  Your Honor, I'm going to object to

14     that.  That's speculation, complete and utter speculation by

15     the agent.

16               THE COURT:  No, I understand, but he's just

17     explaining what he thinks was suspicious as I understand it.

18               THE WITNESS:  That's correct.

19               MR. TORREZ:  I was just going to say, Your Honor,

20     that's based on his experience.

21               THE COURT:  Anything else that you considered to be a

22     lie other than the discrepancy in the way they got from Chicago

23     to Phoenix and the inconsistency in your mind of taking a train

24     back when they intended to buy a car?

25               THE WITNESS:  No, that was it, the -- the big one,

1    and also the stuff I saw in the room, Your Honor.  That was

2    what I had at the time.

3            THE COURT:  All right.  Go ahead.  We're not quite

4    finished.

5            (Recording played.  See transcript, Government's

6            Exhibit 2, Page 29, Line 19, through Page 30, Line 11.)

7            THE COURT:  Why did you make the comment that you

8    thought they were smoking bath salts?

9            THE WITNESS:  I'm telling Agent Perry.  Agent Perry

10   cannot see what I see in the room, and they had in the luggage

11   all these canisters of bath salts, and they were out --

12   throughout the luggage, and unfortunately, a lot of -- bath

13   salts are a common thing for people to smoke.  It didn't make

14   sense to me they'd go out to buy those.  You could buy them

15   anywhere.  I couldn't find any personal res -- any personal use

16   methamphetamine in the search of that room.  It was so dark, I

17   couldn't find any, so I made the assumption they must be

18   smelling the -- selling the bath salts because of the butane

19   torches and the dirty pipes I found in the room.

20           THE COURT:  All right.  Go ahead, Mr. Torrez.  We

21   completed the taped conversations, but what else do you want to

22   ask?

23           MR. TORREZ:  Well, I was just going to show him some

24   photographs, Your Honor, and ask about the consent a little

25   bit.

1   BY MR. TORREZ:

2   Q.   Now, with regard to Mr. Cheun, prior to entering the room

3   and beginning to search the luggage, how many times had you

4   asked him, to the best of your recollection -- recollection

5   based on the transcript, for consent?

6   A.   He volunteered it, and I asked twice.

7   Q.   Now, when you're doing -- in the course of the

8   conversation, you asked to look into the gift-wrapped package;

9   is that correct?

10  A.   That's correct.

11  Q.   This is Government's Exhibit 7.  What is that?

12  A.   That is an inter -- a picture I took looking down into the

13  sack prior to executing the search warrant.

14  Q.   I think that the -- and when you -- when you got to this

15  particular packet, did he make it clear to you that he did not

16  want you to go into that?

17  A.   He did not want me to rip it, so I did not open it.

18  Q.   Okay.  So you, when you say not rip it, did you take that

19  as a consent to search the ba -- the gift bag, or --

20  A.   No, I took that as a re --

21  Q.   -- how did you treat it?  How did you treat it?

22  A.   I took that as a refusal to con -- for permission or

23  consent to search, and just so you're all clear, the bag was

24  actually taped up, just poorly, poorly done.  It was the Scotch

25  tape was taping everything up, but it was a really shoddy job.

1    Q.   And when you say -- I show you what's been marked as

2    Government's Exhibit No. 3.   What is Government's

3    Exhibit No. 3?

4    A.   That's one of the butane torches.   It has liquid gas in

5    it, and you -- you put a little flame to it, and it becomes

6    like a torch and it heats something up and it -- you can buy

7    them in all the head shops.   They're liquid fuel.

8    Q.   And what's it used for just so the record's clear?

9    A.   Getting intense heat per -- people who smoke pipes use

10   that to get an intense heat on the product they're trying to

11   burn.

12   Q.   Okay.

13   A.   You would not use that for marijuana.   It would be used

14   for bath salts, crack, or methamphetamine.

15   Q.   And did you see some sort of residue on the pipes?

16   A.   Yes.   The -- the pipes -- the pipe I saw on the -- laying

17   on the floor was dirty.   It had been used and had been smoked.

18   Q.   Okay.   And the butane lighter and the pipes, are they

19   considered paraphernalia?

20   A.   In my book, they are.

21   Q.   Now, showing you Government's Exhibit No. 4, what's

22   Government's Exhibit No. 4?

23   A.   These are two of the bath salts that actually contained

24   methamphetamine that were in the sack, but he had numerous of

25   these lay -- also in his suitcases.   There were a couple others

1  in his suitcases, and they're -- bath salts is you fill a

2  bathtub full of this stuff and put it in there; it gives you

3  soft skin.

4  Q.   And Government's Exhibit No. 5, what is that?

5  A.   That is the bath salt container that was in the white

6  sack.  I -- it was taped shut with Scotch tape.  I opened it

7  up, and that is methamphetamine inside the bath salt container.

8  Q.   I'm showing you Government's Exhibit 6 that has four

9  packages.  What are those?

10  A.   Those are the four packages I took out of the white

11  plastic sack that Mr. Cheun did not want me to open.  The

12  two -- oh, the two on the left are the two bath salt things you

13  just showed me.  The one in the middle is two centri -- two

14  black things, and the one on the end, if I remember, it

15  actually is a geode, the rock-looking thing on the far

16  right-hand side.

17  Q.   So three of them actually had a controlled substance, one

18  did not?

19  A.   That's correct.

20          MR. TORREZ:  Move Exhibits 3 through 7, Your Honor.

21          THE COURT:  Any objection?

22          MS. JOHNSON:  No, Your Honor.

23          THE COURT:  They're admitted.

24      (Government's Exhibits 3 through 7 admitted into

25          evidence.)

1    BY MR. TORREZ:

2    Q.   And calling your attention to the -- what was taking place

3    at the li -- at Page 25, the top of the -- the top of

4    page where -- where you -- you say you were answering a

5    question, now, what was -- where was the defendant at that time

6    when you -- when you responded to this question?

7    A.   He was in the hallway talking to Special Agent Jay Perry.

8    They were having a conversation.  They were outside the room,

9    but he was standing directly in front of the door.  I could

10   hear the conversation, but they were talking to each other.

11   Q.   Okay.  And -- and the other question is this:  Agent Perry

12   was where in relation to the defendant?

13   A.   He was to the north.  Mr. Cheun was to the south, and

14   Mr. Cheun was actually closest to the door of the train, the

15   exit of the train.

16   Q.   Okay.

17   A.   Agent Perry was to the farther -- farest (sic) away exit

18   from the train.

19   Q.   Okay.  So just so it's clear, the defendant was in a

20   position where he could have exited the train?

21   A.   Yes, sir.

22   Q.   And even after he asked you not to rip the package and you

23   took that as a -- as a no and you did not search that package,

24   did you ask him about other containers then that you found or

25   another box?

1    A.   Yes.  There was other containers wrapped up in paper, and

2    you could hear me going through the paper.  And I asked him

3    what it was, and one of them was another geode, and I asked him

4    if I could check, open it or search it.  It was, go right

5    ahead.  And that's what I'm doing with that paper.  I'm

6    unwrapping this geode thing with all this paper, and you --

7    it's hard to hear anything else, and that's when I get to see

8    what a geode is.  It's wrapped up in the paper.  He had no

9    problem with me wrap -- checking those out or searching them.

10   Q.   And you also searched a computer bag, and you asked the

11   defendant about the computer bag; is that correct?

12   A.   That's correct.

13   Q.   And what did he say about the bag?

14   A.   He said it was not his bag.  I made an assumption it must

15   have been Mr. Maddaleni's bag, and I searched that instant to

16   arrest because Mr. Maddaleni was under arrest.

17   Q.   And what did you find in the computer bag?

18   A.   I found a pipe, but later the next day, I found two little

19   baggies of methamphetamine, which I sent off to the laboratory

20   for analysis.

21   Q.   And again, with respect to that pipe, was there residue on

22   that pipe as well?

23   A.   Yes.

24   Q.   And it looks like on the transcript at Page 28, the

25   Line 16, the Line 15 -- I'm sorry, Line 13, you're asking

1   permission to open another box apparently.  Is that before or

2   after the discussion about the gift pack?

3   A.   It was after.  It was a box of cookies, and I had asked

4   him if I could open the cookies to make sure there was nothing

5   inside of those, and I was given permission to do that.

6   Q.   All right.  And in that connection, there are several

7   discussion about other containers, and he's making decisions

8   about those containers, either yes or no; is that correct?

9   A.   Yes.  He's seen everything I'm doing, and I'm asking him.

10  He's answering the question accordingly.

11  Q.   Did it appear to you in any course of the discussions with

12  him that he did not understand what you were saying, anything

13  of that sort?

14  A.   No, sir.  No, sir.  He understood every question I asked

15  him.

16              MR. TORREZ:  Okay.  I'll pass the witness, Your

17  Honor.

18              THE COURT:  You may cross-examine.

19              MS. JOHNSON:  Thank you, Your Honor.

20              May I proceed, Your Honor?

21              THE COURT:  Sure.

22                        CROSS-EXAMINATION

23  BY MS. JOHNSON:

24  Q.   Now, Agent Small, or it's Mr. Small now, right?

25  A.   Yes, it is.


14CR415, 9-23-2014

1   Q.   You taught or teach interdiction, right?

2   A.   That's correct.

3   Q.   In fact, how to conduct interdiction?

4   A.   That's correct.

5   Q.   And in fact, your course materials, one of the things in

6   your course materials when you teach these classes is that you

7   need to make sure that, before you ask somebody consent to

8   search, you hand back their identification, right?

9   A.   Yes.

10  Q.   And in fact, in your course material, you teach other

11  agents or law enforcement officers that you should make an

12  audible statement when you're handing back somebody's ID,

13  right?

14  A.   Yes.

15  Q.   Because that way, there's no dispute about you handing

16  back the identification?

17  A.   That's correct.

18  Q.   In fact, that's in your course materials?

19  A.   I teach that, yes, I do.

20  Q.   And you typically try to do that when you did your

21  encounters, right?

22  A.   I typically do, yes, sir -- yes, ma'am.

23  Q.   Now, as far as this case is concerned, this encounter on

24  January 29th, you testified on direct examination that, when

25  you went to the train, Agent Perry and Mr. -- or Officer Walsh

1   were still at the bus station, right?

2   A.   That is my best recollection.   That's where I left them.

3   Q.   Do you remember testifying at a preliminary hearing --

4   preliminary hearing, excuse me, in this case on January 31st?

5   A.   I remember testifying, yes.

6   Q.   And do you remember being asked the question about where

7   Agent Small and Officer Walsh were?

8   A.   Agent Perry?

9   Q.   Excuse me, Agent Perry and Officer Walsh.

10  A.   I do not remember being asked, but go ahead.

11  Q.   Do you remember being asked, "And where was Officer Perry

12  or Agent Perry at the time you first contacted Mr. Maddaleni?"

13  Do you remember being asked that question?

14  A.   Today, I don't, but go ahead.

15  Q.   Well, let me show you a copy of the transcript of that

16  preliminary hearing.

17          Agent Small, you'd agree with me this is a transcript

18  that's for the preliminary hearing, right?

19  A.   Yes.

20  Q.   And you testified during that hearing, right?

21  A.   Yes, I did.

22  Q.   Let me direct you -- let me direct your attention to

23  Page 15, Line 15, where you were asked about where Agent Perry

24  and Officer Walsh were.

25  A.   The -- my answer was they were in the back in the coach

1  section of the train.

2  Q.   And that was your answer at the preliminary hearing where

3  you testified under oath, right?

4  A.   Yes.

5  Q.   And today, you testified that they were at the bus

6  station?

7  A.   Yes.

8  Q.   And in fact, at the preliminary hearing, you said they

9  were in the back -- they were in the coach section of the

10  train, right?

11  A.   Can you reread the question they asked me?

12  Q.   Why don't let me put it on the prompt here.

13        You'd agree with me, sir, the question is, "And where

14  was Officer Perry or Agent Perry at the time you first

15  contacted Mr. Maddaleni?"

16  A.   Yes.

17  Q.   Right?

18  A.   Yes.

19  Q.   And your answer was, "They were back in the coach section

20  of the train"?

21  A.   Yes.

22  Q.   And the question, "All right.  A completely different

23  car," right?

24  A.   Yes.

25  Q.   "They were at the other end," right?

14CR415, 9-23-2014

1    A.    Yes.

2    Q.    But today, you've told us they were at the bus station,

3    right?

4    A.    I believe the question was I had left them; they were at

5    the bus station.   They were still on the bus when I left, and

6    they -- I found out from the telephone call, which you can hear

7    on the tape, that they were no longer at the bus station; they

8    were on the train.   But when I had left them, they were at the

9    bus station, and I asked, I even asked Jay on the tape, I said,

10   when you leave the bus, come over here.   I was already at the

11   train, and that's how I found out they were at the train.

12   Q.    Now, you've told us also that the train was -- that Car

13   431, that's where Room D was, right?

14   A.    Yes.

15   Q.    That was completely empty?

16   A.    I -- if I said it was completely empty, I misspoke.   A lot

17   of the rooms were empty.   Obviously, the room next to theirs

18   wasn't empty.   There was two people sitting in it.

19   Q.    When you approached Mr. Maddaleni and Mr. Cheun's room,

20   room -- Car 431 was empty, was it not?

21   A.    I couldn't tell you if all the rooms were empty.   I

22   didn't -- I just went to check on their room, and I did not

23   look at the rooms on the first level.   I couldn't tell you who

24   was downstairs.

25   Q.    I'm talking about upstairs, sir.

1   A.   They couldn't have been empty, obviously, because there

2   was people sitting right next to their room.  So it wasn't

3   empty.

4   Q.   All right.  Let me direct your attention to Page 6 of the

5   transcript from the preliminary hearing at Line 19.   You

6   testified, "So I went to the door, knocked on the door, and

7   they were in Room D.  They were the only room occupied up

8   there."  Correct?

9   A.   That's correct.  That's what I said.

10  Q.   And no -- we know that a couple later entered the car,

11  right?

12  A.   Right.

13  Q.   But when you first approached, Room D was the only one

14  occupied up there?

15  A.   That could have been it.

16  Q.   Now, let's talk about this encounter when you first go up

17  to Car 431.  You went -- there's only one way in and one way

18  out of Car 431, right?

19  A.   Out of the car, yes.

20  Q.   And that door, you enter from the bottom level, right?

21  A.   Yes.  That's correct.

22  Q.   And you have to go upstairs to get to the second floor

23  where Room D is?

24  A.   Yes.

25  Q.   And in fact, on the upper level, there are a number of

1    rooms.  In fact, there's Rooms A through E, right?

2    A.    Yes.

3    Q.    And as we've just established, Room D was the only one

4    occupied when you approached the -- the Room D?

5    A.    Yes.

6    Q.    And the only way out of the second level is to go down the

7    stairs, right?

8    A.    Well, out of that car.  There's two other ways out of that

9    car.

10   Q.    Tell us what other ways.

11   A.    To the north of Room -- Car 431 is a transition sleeper,

12   and there's a door.  If you walk to the north of their room,

13   you keep walking, there's a door to another train car.  And if

14   you do the same, you don't have to go to the lower level.  You

15   stay on the second level.  To the south is another door

16   opening.  You can walk all the way through that train on the

17   upper level of the train, so you can get out of that car

18   through those two ends and then go to the lower level and get

19   off the train.  But through Car 431, if you wanted to get off

20   that train, the only way off is down those stairs, off of 431.

21   Q.    Right.  So there are two -- on either end of Car 431,

22   there are two doors that go to another sleeper car.

23   A.    Right.

24   Q.    Right?

25   A.    That's correct.

14CR415, 9-23-2014

1   Q.   Not to the exterior, not to outside?

2   A.   You could get outside if you walk to a lower level of

3   those cars and then off the train.

4   Q.   But you'd have to go through that other car?

5   A.   That's correct.

6   Q.   But there's only one door from Car 431 that actually goes

7   outside, directly outside?

8   A.   That is correct.

9   Q.   Now, the hallway is approximately 24 inches wide?

10  A.   Yes.

11  Q.   And from one end of the car to -- or the beginning of

12  Room A to the platform that goes to the stairs of Car 431, it's

13  approximately nine feet, right?

14  A.   Well, from Room A to where, where?

15  Q.   Well, let me show you -- let me show you what has been

16  marked as Defendant's Exhibit D.

17          May I approach the witness, Your Honor?

18          THE COURT:  Sure.

19  BY MS. JOHNSON:

20  Q.   Agent Small, let me show you what's been marked as

21  Defendant's Exhibit D.  You would agree with me that those are

22  diagrams from the Amtrak Web site of what the sleeper cars look

23  like, right?

24  A.   Yes.

25  Q.   And in fact, the one that's labeled, "Superliner,"

14CR415, 9-23-2014

1   accurately depicts Car 431, right?

2   A.   That's correct.

3   Q.   And you have no reason to doubt the accuracy of those

4   diagrams?

5   A.   No.

6          MS. JOHNSON:  Your Honor, I would move into evidence

7   Defendant's Exhibit D.

8          THE COURT:  Any objection?

9          MR. TORREZ:  I have no objection.

10          THE COURT:  They're admitted without objection.

11      (Defendant's Exhibit D admitted into evidence.)

12   BY MS. JOHNSON:

13   Q.   Now, let me put this on the prompt here, Agent Small.

14   Now, the one that is labeled, "Superliner," this is what Car

15   431 looks like, right?

16   A.   Exactly right.

17   Q.   And Mr. Cheun and Mr. Maddaleni were -- were in Sleeper D,

18   right?

19   A.   Yes, they were.

20   Q.   And the two exits that you were talking about or the one

21   exit that goes directly outside is this one where my finger is

22   pointing, right?

23   A.   Yes.

24   Q.   And that's the going down the stairs, right?

25   A.   Yes.

14CR415, 9-23-2014

```
1   Q.   All right.  So my question was, do you have any reason to

2   disagree that from this end where my finger is to the end of

3   Room E is approximately nine feet?

4   A.   Yes, I disagree with that.

5   Q.   You disagree with that?  How far is it?

6   A.   I'd say it's more like 20 feet.  It's --

7   Q.   All right.  Okay.  But you don't disagree that the hallway

8   is only 24 inches wide?

9   A.   That's correct.

10  Q.   Now, you knock on the door, and Mr. Maddaleni comes to the

11  door, right?

12  A.   Yes.

13  Q.   And he goes -- he shuts the door each time he comes in and

14  out, right?

15  A.   Yes.

16  Q.   And then at some point, you -- he gives you his ticket.

17  Do you recall that?

18  A.   Yes.

19  Q.   And in fact, let me direct your attention to Page --

20  Page 5 of the transcript.

21  A.   Okay.

22  Q.   Line 10 where you say, "And I don't mean to be doing this

23  to you.  Do you have your ID with you, Phil," right?  You're

24  asking for his ID?

25  A.   Yes.
```

1    Q.   And then on Line 14, you say, "Here, take that back with

2    you."  You give him back the ticket, right?

3    A.   That's correct.

4    Q.   And Mr. Maddaleni gives you his ID?

5    A.   Yes, --

6    Q.   Right?

7    A.   -- after he comes back out, he hands me an ID.

8    Q.   You'd agree with me that, going through this entire

9    transcript, Agent Small, nowhere after you say on Page 5,

10   Line 14, "Here, take that back," do you return that ID to

11   Mr. Maddaleni?

12   A.   The -- nowhere do I say I returned it?  Is that your

13   question?

14   Q.   Nowhere on this transcript is it reflected that you tell

15   Mr. Maddaleni, here's your ID back or, here, take this back.

16   A.   Just give me a second.  That's correct.  I don't say,

17   here's your ID back or take that back.  You're right.

18   Q.   Because, in fact, you did not return Mr. Maddaleni's ID to

19   him, did you?

20   A.   No, I returned it to him.

21   Q.   But it's not reflected on the transcript, is it?

22   A.   That's correct.  I did not mention it in the tape.

23   Q.   But that's something that you teach to officers, is always

24   audibly state when you return the ID to a person you're having

25   an encounter with?

1    A.   To do the perfect encounter, that's exactly right.

2    Q.   Now, approximately -- Mr. Maddaleni is in the room for

3    approximately eight to ten minutes before he comes back out,

4    right?

5    A.   Well, I don't know the first time that that's right.

6    There was a time where he -- he wasn't out when Mr. Cheun was

7    out.  That might have been eight to ten minutes, but

8    originally, when he went to get his ticket, he wasn't in there

9    eight to ten minutes, I don't believe, if that's the time

10   you're talking about.

11   Q.   Do you recall again testifying at the preliminary hearing

12   and testifying that you believe that you were asked a question,

13   and I believe your testimony was he was in the room, referring

14   to Mr. Maddaleni, for about another nine or ten minutes.  Do

15   you recall that?

16   A.   That, that's correct, but I don't -- at one time, he was

17   in the room by himself for a while, and I guesstimate eight,

18   nine to ten minutes, but I don't think it was right when I

19   asked to see his ID.

20   Q.   That was -- when was that?

21   A.   When he said he had to go pee, and he was in the room, and

22   then Mr. Cheun came out, and Mr. Cheun and I had a long

23   conversation, and Mr. Cheun went back into the room and came

24   back out.  I didn't see Mr. Maddaleni again until the door was

25   open and he was standing there with his suitcase.

1    Q.   And that was about eight to ten minutes?

2    A.   That was a guesstimate that day.  I think it was more like

3    four or five now.

4    Q.   Now, during the time that Mr. Maddaleni kept going in and

5    out, you called Agent Perry, right?

6    A.   I believe that's when I did it, yes.

7    Q.   And you told him, you said to him, hey, Jay, when you're

8    done at the bus.  Do you remember that?

9    A.   Yes, I remember that.

10   Q.   Can you -- can you come to the first sleeper car, right?

11   A.   Yes.

12   Q.   And you tell him, I got two in a room, and they're not

13   coming out too good, right?

14   A.   Yes.

15   Q.   Because you wanted them to come out, right?

16   A.   Well, not that I wanted them to come out, it's just the

17   normal course of encounters, they -- it wasn't a normal

18   encounter with these two guys.

19   Q.   But if we're talking about a consensual encounter, people

20   don't have to come out, right?

21   A.   That's correct.

22   Q.   But yet you're calling for backup because these two guys

23   are not coming out too good, right?

24   A.   That's correct.

25   Q.   Now, Mr. Cheun comes out after you called for backup,

1    right?

2    A.   Yes.

3    Q.   And while you're talking to Mr. Cheun the first time,

4    Officer Walsh approaches you, right?

5    A.   I'd have to look at the transcript.  I think it was

6    actually the -- the second time.  Mr. Cheun actually went into

7    the room to get his passport, and I think when he came out with

8    his passport's when he -- Mr. Walsh showed up.  I'd have to

9    look at the transcript to be sure.

10   Q.   And in fact, you told Mr. -- when Mr. Cheun comes back out

11   with his passport, he asked you what did you need with this,

12   right?

13   A.   Yes.

14   Q.   And you said, "Just your passport," right?

15   A.   Yes.

16   Q.   And at that point, Agent Walsh is standing right next to

17   you, is he not?

18   A.   He's standing behind me, yes.

19   Q.   And he's standing to the south of Room D, right?

20   A.   Yes.

21   Q.   I'm going to show you what's been marked as Defendant's

22   Exhibit A and Defendant's Exhibit B.

23           Let me show you Defendant's Exhibit A.  You'd agree

24   with me, sir, that that's a photograph of Car 431, is it not?

25   A.   Oh, I couldn't tell you which car it is, but it's a

```
 1   typical photograph of a Superliner sleep -- a deluxe sleeper
 2   area.
 3   Q.   Do you have any reason to disagree that that is the
 4   photograph of Room 430 -- excuse me, Car 431?  I direct your
 5   attention to that door that appears open.  Do you see the
 6   letter "D" right next to that door?
 7   A.   Oh, boy, it's hard to see, but I have no reason to doubt
 8   you.  I mean, that -- this looks like the hallway.  I mean,
 9   it -- it -- counting back from the doors, that looks like it
10   should be Door No. D.  Counting back from the end there, A, B,
11   C, D.
12           MS. JOHNSON:  Your Honor, I would move into evidence
13   Defendant's Exhibit A.
14           THE COURT:  Any objection?
15           MR. TORREZ:  Well, our objection is, Your Honor, that
16   these photographs, I haven't seen them until this morning.  If
17   he can identify them --
18           THE COURT:  Why don't you look at them and tell me if
19   you object.
20           MS. JOHNSON:  Your Honor, and I have my investigator
21   who took these photographs prepared to testify if there's any
22   dispute about whether or not that's Car 431 if the Court would
23   like me to establish the foundation through him.
24           THE COURT:  Well, I don't know if that's necessary.
25   Why are we arguing over this at this hearing?
```

1          MR. TORREZ:  Well, that's my only objection.  It

2    would be nice to have these in advance of the examination, Your

3    Honor.

4          THE COURT:  It certainly would be nice to have them

5    what?  I couldn't hear you.

6          MR. TORREZ:  In advance of the examination, it would

7    be nice to have the exhibit.

8          MS. JOHNSON:  Your Honor, my investigator was finally

9    able to get on the train.  It was very difficult.  He was not

10   allowed to go on the train, so --

11         THE COURT:  Well, can you give copies to Mr. Torrez?

12         MS. JOHNSON:  Yes, Your Honor.  I'm happy to give him

13   an extra copy of A.

14         THE COURT:  Give him time to look at them and see if

15   there's any objection.

16         MR. TORREZ:  If I may have a moment?

17         THE COURT:  Sure.

18      (Mr. Torrez and the Witness confer.)

19         MS. JOHNSON:  Your Honor, actually, I'll withdraw

20   those.  I will introduce them through my witness.

21         THE COURT:  That's fine.

22         MS. JOHNSON:  Pres, I'm withdrawing those.  I'm

23   withdrawing them at this time.  I'm going to introduce them

24   through my witness.

25         MR. TORREZ:  I wouldn't have any objection.

1          THE COURT:  All right.  There's no objection, so

2     they're in evidence.

3          (Defendant's Exhibit A and B admitted into evidence.)

4          MS. JOHNSON:  All right.

5          THE COURT:  Let's move on.

6     BY MS. JOHNSON:

7     Q.   Now, do you recall -- let me direct your attention, Agent

8     Small, to Page 16 of the transcript, Line 23.  Mr. Cheun comes

9     back out and asks you, what do you need, right?

10    A.   Yes.

11    Q.   And you tell him, "Just your passport," right?

12    A.   Yes.

13    Q.   And he gives you his passport?

14    A.   Yes, he did.

15    Q.   Now, let me direct your attention to Page 17 where

16    Mr. Cheun says, "I'm sorry, I'm just getting really like --"

17    Do you recall that?

18    A.   Yes.

19    Q.   And at that point, Officer Walsh is standing right behind

20    you, right?

21    A.   Hold on just a second.

22              No, that's not correct.

23    Q.   That's not correct?

24    A.   No.

25    Q.   When did -- is it your testimony that, when Mr. Cheun

14CR415, 9-23-2014

1   says, "I'm sorry, I'm just getting really like --" Agent Walsh

2   was -- or Officer Walsh was not standing behind you?

3   A.    That is correct.  I don't introduce Officer Walsh until

4   Page 20, Line 1.

5   Q.    You don't introduce him until then, but when Mr. Cheun --

6   and you just earlier testified that Agent Walsh approached when

7   Mr. Cheun came out the second time with the passport, right?

8   That was your testimony earlier, wasn't it?

9   A.    Well, without looking at the transcript, but the

10  transcript is when I introduced him.  When he's there, I'll

11  introduce him as my partner, and that's where I introduced him,

12  at Line 20 -- Page 20, Line 1.

13  Q.    So you're correcting your testimony that it was not when

14  Mr. Cheun handed you his passport that Officer Walsh

15  approached?

16  A.    That is correct according to the transcript.  That's when

17  I did it.  I -- the passport may have been out and about at

18  that time, but it's not the minute he handed me the passport.

19  Q.    Now, you asked -- back to Page 17, you asked Mr. Cheun if

20  he had a good trip out there, right, Line 4/5?

21  A.    Yes.  Yes.

22  Q.    And his answer was, "Not really"?

23  A.    That's correct.

24  Q.    Now, do you recall Mr. Cheun appeared to have just been

25  sleeping, right?

1   A.   They both appeared like they had been in the bed.  I can't
2   tell you if they were sleeping or not.
3   Q.   And do you recall Mr. Cheun appearing somewhat ill and
4   pale?
5   A.   I couldn't tell you if he was ill or pale.  I never -- had
6   never seen him before.
7   Q.   But he did tell you he didn't have a good trip.  Do you
8   recall that?
9   A.   Yes.
10   Q.   Now, when you testified that you asked Mr. Cheun for
11   permission to search his bag, he said, "but for what reason,"
12   right?
13   A.   Yes.
14   Q.   And then you never had an opportunity to finish your
15   encounter with Mr. Cheun, because then Mr. Maddaleni opened the
16   door to the sleeper compartment?
17         THE COURT:  Where are we referring to on the
18   transcript?
19   BY MS. JOHNSON:
20   Q.   Your Honor, we're at -- well, I'll get to that point in
21   just a second.  Let me direct your attention to Page 19.
22   A.   Okay.
23   Q.   Mr. Cheun said, "Yeah, but for what reason," right?
24   A.   Yes.
25   Q.   And then you explained.  Then let me direct your attention

 1  down on Page 19, Line 23.  Mr. Cheun says, "Because I'm like --

 2  I'm like I didn't do anything.  I just woke up."  Do you recall

 3  Mr. Cheun saying that?

 4  A.   Yes.

 5  Q.   And Mr. Cheun's looking right at Officer Walsh, is he not?

 6  A.   At that time, he could have been, because I introduced

 7  Mr. Walsh at the top of the next page.

 8  Q.   And at this point, let me direct your attention to the

 9  prompt here, Defendant's Exhibit A.

10          If I may just have a moment, Your Honor, to get this

11  light on.  Woops.  I may have done something wrong.  Oh, here

12  we go.  No, wait.

13       (Ms. Johnson and the Law Clerk confer.)

14  BY MS. JOHNSON:

15  Q.   I'm going to point with my pen.  This is Room D, is it

16  not?

17  A.   Yes.

18  Q.   Okay.  And this is the hallway?

19  A.   Yes.

20  Q.   And Mr. Cheun is standing right out here, right?

21  A.   Right in front of the door, Room D, yes.

22  Q.   And you're standing right to the south, right?

23  A.   Yes, right about where your hand -- your fingertips just

24  were, right in that area is where I was standing.

25  Q.   Right around here?

14CR415, 9-23-2014

1  A.   A little farther.  Well, touch the screen.

2  Q.   It's not -- it's not in the photo, is it?

3  A.   No, it's not.  Where I'm standing, you -- if I was in

4  that --

5  Q.   It's going this way?

6  A.   If I was in that photograph right now, I'd be blocking

7  everything because I'm farther back, right in the camera lens.

8  Q.   Okay.  You're talking about you're down this way?

9  A.   That's correct.

10  Q.   Okay.  And Mr. Cheun's right here in front of the door?

11  A.   That's correct.

12  Q.   And the only way to exit this car is going south on this

13  hall -- in this hall -- on this hallway, right?

14  A.   The question you ask, get out of that car, you're right.

15  The only way out of Car 431 is behind me, down those stairs.

16  Q.   Okay.  But you're blocking the hallway, right?

17  A.   To get out that door.  There's other ways off the train.

18  Q.   And we're -- and when you say, "other ways," you're

19  talking about going to another sleeper car?

20  A.   Right.

21  Q.   Not going outside?

22  A.   Or you could go outside through another sleeper car.

23  Q.   Okay.  But not directly outside from Car 431?

24  A.   If -- the question you asked me, to get off the car, Car

25  431, the only way he could get off it was walk to the south,

14CR415, 9-23-2014

1    down the stairs, off of Car 431.

2    Q.   All right.  And then at that point when, Page 19, bottom

3    of the page, Line 24, Mr. Cheun says, "I'm like I didn't do

4    anything.  I just woke up," he's looking at Officer Walsh,

5    correct?

6    A.   There is -- I can't say who he's looking at, but there's a

7    good possibility due at the top of the next page I introduce

8    Mr. Walsh as my partner.  So that's a very good possibility he

9    was looking at him.  I don't --

10   Q.   And you say, "This is my partner," right?

11   A.   That's correct.

12   Q.   And Officer Walsh is also wearing a badge hanging around

13   his neck?

14   A.   I do not know.

15   Q.   And at that point, Line -- Page 20, Line 4 through 6, is

16   when Mr. Maddaleni opens the door to Room D, right?

17   A.   Right around Line 6 or 7, yes.

18   Q.   And so then you -- you turn to Mr. Maddaleni and you go --

19   you ask him to walk -- if he could walk into Room D, and you go

20   in, right?

21   A.   Yes.

22   Q.   And Mr. Cheun is still standing right outside in the

23   hallway?

24   A.   Yes.

25   Q.   And Agent or Officer Walsh is now standing in front of

1    Mr. Cheun to the south?

2    A.   Yes.

3    Q.   And now, Officer Walsh is blocking the -- Mr. Cheun's

4    egress to the door that goes to outside from Car 431?

5    A.   Yes.  He could be.  Out of Car 431.

6    Q.   And in fact, Mr. Walsh is close enough to Mr. Cheun that

7    Mr. Maddaleni, who's still in Room D, could see Mr. Walsh,

8    right?

9    A.   See Mr. Walsh?

10        MR. TORREZ:  As -- Your Honor, I guess there's

11   speculation unless he knows.

12        THE WITNESS:  I -- I can't tell you if he could see

13   him.  I was just thinking that in my head.  I don't know if he

14   could see him or not based on the small door and me being in

15   the way.  I can't answer that question.

16   BY MS. JOHNSON:

17   Q.   Well, let me direct your attention to Page 20, Line 19 and

18   20.  You tell Mr. Maddaleni, "This is my partner right there,"

19   right?

20   A.   Yes, and I -- I point back.  I point to the direction.  I

21   can't see if he's seeing where I'm pointing to, but I do point

22   to him.  Because you've got to remember this is close quarters,

23   and I ca -- I -- from inside the room, I cannot tell you what

24   Mr. Maddaleni could see outside the room.

25   Q.   Well, you could see Officer Walsh, right?

1   A.   Oh, yes.  He was right behind me.

2   Q.   And you're inside the room now?

3   A.   Uh, not -- what line did you just ask me about?

4   Q.   Lines 18 through 20.

5   A.   I'm stepping into the room, and I take my left hand and I

6   point to him.  I let him know.  It's just an officer safety

7   thing, let him know there's other police officers here, and I'm

8   pointing to him:  "This is my partner."

9   Q.   And between Lines 17 and 18, you testified on direct

10  examination that's when you went into Room D, right?

11  A.   That's -- that's correct.

12  Q.   And then Line 18, you say, "All right.  I'll just step

13  into the room here," right?

14  A.   Yes.

15  Q.   And you say, "This is my partner right there."

16  A.   Yes.

17  Q.   And you are going into the room, and Officer Walsh is

18  standing almost in front of Room D, right?

19  A.   I can't say where he's standing.  I -- I was just pointing

20  to him.  Where he was standing, I do not know.  I pointed to

21  him.

22  Q.   So you go in and you search Mr. Maddaleni's bag, right?

23  A.   Yes.

24  Q.   And do you remember finding some pipes in his bag later

25  during your search, either at the station -- or excuse me, at

1  your office or in the room then?

2  A.   Yes.

3  Q.   And in fact, the pipes that you found in this case were in

4  Mr. Maddaleni's bag, were they not?

5  A.   I found more than one set of pipes.  My recollection,

6  there were pipes in both pieces of luggage, actually three

7  pieces of luggage:  The two suitcases, one Mr. Maddaleni's, one

8  Mr. Cheun's, and then the black computer bag that I asked

9  about.  There were pipes in all three, and there was actually

10 one pipe laying on the floor in the room next to the butane

11 torch.

12 Q.   All right.  Let's talk about that a little bit, because

13 you were asked by the Court why you placed Mr. Cheun under

14 arrest, and you testified, it's because I found some pipes,

15 right?

16 A.   That was one of the reasons.

17 Q.   All right.  So the pipes that you found were actually in

18 Mr. Maddaleni's bag, were they not?

19 A.   My recollection, I found pipes in both suitcases during

20 the searches.  They were bri -- they had just purchased them,

21 and they were wrapped up in plastic like they were given to him

22 at a store, and they were in both suitcases plus, like I just

23 testified, in the black computer bag.

24 Q.   Let me show you what's been marked as Defendant's Exhibits

25 F and E.

1          Let me show you Defendant's Exhibit F and E.

2    A.    Okay.

3    Q.    You would agree with me, sir, that those are two pipes

4    contained in a black bag, right, in a black small case?

5    A.    Yes.

6    Q.    And those were found in Mr. Maddaleni's suitcase, right?

7    A.    That, yes, these were.

8    Q.    Okay.  And now, you testified that you found a pipe lying

9    on the floor?

10   A.    Yes.

11   Q.    Do you have a photograph of that pipe?

12   A.    No, but we have it in evidence in an evidence bag at the

13   office.  I don't have any photographs of it.

14   Q.    And you also testified that you found a butane torch?

15   A.    Two of them.  One was on the floor and one was in one of

16   the two suitcases.  Without looking at my report, I couldn't

17   tell you which suitcase they were in, but one of the butane

18   torches was seen on the floor in the room.

19   Q.    And butane torches can be used to light cigarettes, or can

20   they not?

21   A.    I don't smoke cigarettes, so I don't know.  I wouldn't try

22   lighting one.

23   Q.    And that butane torch, those actually two butane torches

24   were actually found in Mr. Maddaleni's bag, were they not?

25   A.    One was in Mr. Maddaleni's.  I remember seeing one on the

1    floor of that room that day.

2    Q.    And they were brand-new, were they not?

3    A.    They appeared to me to be brand-new.

4    Q.    Now, after you searched Mr. Maddaleni's bag, you placed

5    him under arrest?

6    A.    Yes.

7    Q.    And Mr. Cheun is standing right by Room D, right in the

8    hallway, right?

9    A.    Yes.  He's right at the door.

10   Q.    And Mr. Cheun sees you place Mr. Maddaleni under arrest?

11   A.    I'm assuming so.  He couldn't have missed it.

12   Q.    And without a moment's hesitation, you turned to Mr. Cheun

13   and you tell him, "Your partner is under arrest.  Do you have a

14   suitcase with you?"

15   A.    Yes.

16   Q.    Right?

17   A.    Yes, I do.

18   Q.    And that's on Page 21, Lines 13 and 14, right?

19   A.    Yes.

20   Q.    And you just told Mr. Maddaleni, turn around, face me, put

21   your hands behind your back?

22   A.    Yes.

23   Q.    And on the audio, you could hear the handcuffs being put

24   on Mr. Maddaleni's hands, right?

25   A.    Yes, you can.

14CR415, 9-23-2014

1  Q.   And immediately, you turn to Mr. Cheun and you say, "All

2  right.   Your partner is under arrest.   Do you have a suitcase

3  with you?"

4  A.   That's correct.

5  Q.   And at this point, Agent Perry walks up to stand right in

6  front of Room D?

7  A.   I don't think he's right in front of it.   He is to my

8  south.   He is bet -- I am between Mr. Cheun and Mr. Perry,

9  Agent Perry.

10 Q.   But Agent Perry walks up?

11 A.   Yes.

12 Q.   Okay.   And Agent Walsh or Officer Walsh walks

13 Mr. Maddaleni to the end of the hall?

14 A.   He walked him away, and I can't tell you where he walked

15 him because I didn't see him again.

16 Q.   Now, at this point, you didn't advise Mr. Cheun of his

17 constitutional rights?

18 A.   No, I did not.

19 Q.   And you and Agent Perry are standing to the south of

20 Mr. Cheun?

21 A.   Yes.

22 Q.   So if we look at Exhibit A, Mr. Cheun is standing right,

23 approximately, right here where my pen is?

24 A.   Probably a little bit north of there and a little -- right

25 about there maybe.

14CR415, 9-23-2014

1    Q.    Okay.  And then you're standing right --

2    A.    Right --

3    Q.    -- around here, right?

4    A.    Right in the middle of the door, because I just came out

5    of the room.

6    Q.    And Agent Perry is right behind you?

7    A.    Right.  He's behind me about a foot or so.

8              THE COURT:  Okay.  Counsel, let me ask, how much

9    longer do you think the examination will take?

10             MS. JOHNSON:  Your Honor, probably about another 20

11   minutes.  Would you like -- do you need to break?

12             THE COURT:  Well, it's about 20 minutes after twelve.

13   I have a hearing at 1:30 that's going to take an hour probably.

14   Is it possible for you all to come back this afternoon around

15   three o'clock?

16             MS. JOHNSON:  Your Honor, I have a sentencing at 2:30

17   in front of Judge Herrera.  I can come back as soon as I'm done

18   with that sentencing hearing, and that should be maybe a

19   30-minute sentencing.

20             THE COURT:  Do you know if that's on a trailing

21   calendar?

22             MS. JOHNSON:  I can check with her court reporter.  I

23   don't believe it is, Your Honor, but I can check.

24             THE COURT:  Okay.

25             MS. JOHNSON:  They know I'm in front of Your Honor.

1    In fact, when they scheduled it, I advised them that I was in

2    front of Your Honor and I --

3              THE COURT:  Let me ask Mr. Torrez.  Can you come back

4    at three?

5              MR. TORREZ:  At three o'clock?

6              THE COURT:  Yes.

7              MR. TORREZ:  Yes, Your Honor.

8              THE COURT:  Okay.  And Agent Small?

9              THE WITNESS:  Yes, sir, I can.

10             THE COURT:  All right.  Why don't we recess then

11   until three o'clock.

12         (Recess at 12:20 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

14CR415, 9-23-2014

1                          REPORTER'S CERTIFICATE

2

3            I, THOMAS L. GARRETT, Official Court Reporter for the

4    United States District Court, District of New Mexico, hereby

5    certify that I reported the proceedings in 14CR415 and that the

6    pages contained herein are a true and correct transcript of the

7    proceedings.

8            I FURTHER CERTIFY that I am neither employed by nor

9    related to any of the parties or attorneys in this case and

10   that I have no interest whatsoever in the final disposition of

11   this case in any court.

12           WITNESS MY HAND this 9th day of October 2014.

13

14                              _____

15                              Thomas L. Garrett, CCR, FCRR
                                Official Court Reporter
16                              CCR No. 255

17

18

19

20

21

22

23

24

25

14CR415, 9-23-2014